Theol A. BARSTAD, Plaintiff-Respondent,†

v.

Wanda K. FRAZIER, Defendant-Appellant-Petitioner,

Michael L. WEISS, Defendant.

Supreme Court

*No. 82–1182. Argued February 27, 1984.—Decided May 30, 1984.*

(Also reported in 348 N.W.2d 479.)

† Motion for reconsideration denied, July 24, 1984, without costs. STEINMETZ, J., dissents. HEFFERNAN, C.J., and WILLIAM A. BABLITCH, J., took no part.

550

For the defendant-appellant-petitioner there were briefs by *Donna M. Mueller* and *Wisconsin Judicare, Inc.,* Wausau, and oral argument by *Ms. Mueller.*

For the plaintiff-respondent there was a brief by *Terrence M. Gherty, Susan Schleif Gherty* and *Gherty and Dunlap,* Hudson, and oral argument by *Terrence M. Gherty.*

DAY, J. This is a review of a decision of the court of appeals[1] affirming a judgment of the circuit court for St. Croix county, Honorable John G. Bartholomew, Circuit Judge, awarding custody of Michael Scott Frazier to his grandmother Theol Barstad. This review presents the question of the standard to be applied in a custody dispute between a parent and a third party. We hold that unless the court finds that the parent is unfit or unable to care for the child or that there are compelling reasons for denying custody to the parent, the court must grant custody to the child's parent. We hold that the trial court's conclusion that compelling reasons required that Wanda Frazier, Michael's mother, be denied custody of her son is not supported by the record. We reverse the decision of the court of appeals and order that custody be returned to Wanda Frazier.

Michael Frazier was born on November 24, 1973. His mother, Wanda K. Frazier, was sixteen years old at the time and living with her father and stepmother in North Hudson, Wisconsin. Within three months after Michael was born, both he and his mother had left North Hudson and taken up residence with Theol Barstad, Wanda Frazier's mother, in St. Paul, Minnesota. Shortly thereafter, Michael, his mother and his grandmother all returned to

[1] *Barstad v. Frazier,* 112 Wis. 2d 343, 332 N.W.2d 835 (Ct. App. 1983).

North Hudson where they lived together until February of 1977. At that point, Wanda Frazier and Michael moved out of Theol Barstad's home. They lived for a short time with a male friend of Ms. Frazier and then moved into a rented apartment. Ms. Frazier was working at the time and left Michael under the supervision of a babysitter or day care when she was away. In August of 1977 Michael was returned to Theol Barstad's home where he has remained ever since.

During the latter part of 1977 and the first part of 1978, Wanda Frazier lived in St. Paul. In August of 1978, she married David Emory and lived with him in New Richmond, Wisconsin until November of that year when she returned to her mother's home in North Hudson.[2] She remained with her mother until June of 1980. In July of 1980, Ms. Frazier began living with another male friend. In June of 1981, Theol Barstad commenced a custody action in the circuit court for St. Croix county under sec. 767.02(1)(c), Stats. 1979–80, seeking custody of Michael.[3] The complaint named Wanda Frazier and Michael L. Weiss, Michael Frazier's father, as defendants.[4] A guardian ad litem was appointed and a hearing on the matter was held on December 21 and 30, 1981.

At the time of the custody hearing, Wanda Frazier was living with the male friend in a rented house in South

---

[2] David Emory and Wanda Frazier were divorced in March of 1980.

[3] Under sec. 48.435, Stats. 1979–80: "[t]he mother of a child born out of wedlock has legal custody of the child unless the court grants legal custody to another person or transfers legal custody to an agency." Under sec. 48.02(12), "legal custody" in one other than a parent is "subject to any existing parental rights and responsibilities. . . ." Ms. Frazier's parental rights had not been terminated.

[4] The trial court found that Michael Weiss entered into a paternity agreement wherein he agreed to pay support on October 13, 1975. He did not participate in these proceedings.

Haven, Minnesota. Neither Ms. Frazier nor her friend was employed fulltime. He was supporting the household with his savings. Both individuals testified that they had no plans to marry in the near future. They also testified that their relationship was otherwise similar to a traditional married couple with Ms. Frazier taking primary responsibility for housekeeping and he providing economic support. Ms. Frazier testified that from the time she left her mother's home up until the time of the hearing she had visited Michael on a weekly basis.

At the time of the custody hearing, Theol Barstad, aged 45, was married to Roger Barstad, aged 39, and living in a house in North Hudson. Roger Barstad was employed fulltime and Theol Barstad did babysitting at home. Theol Barstad was receiving Aid to Families with Dependent Children for the support of Michael at the time of the hearing. Mrs. Barstad had been married on three previous occasions each of the marriages having ended in divorce.

Home studies were made of both Mrs. Barstad's home and that of her daughter. Those studies did not show that either of the parties were unfit to have custody of Michael.

The trial court judge conducted an *in camera* interview with Michael and found him to be a bright, friendly and intelligent child who was doing well in school and happy in his present surroundings.

Based on the best interests of the child criteria and the recommendations of the guardian ad litem, the trial court awarded custody of Michael to Theol Barstad. The court stated that its decision was "based on the present stability which the grandmother has given and which is reflected in the happy, well-adjusted boy . . . as contrasted to the unknown future of Wanda Frazier." The court further stated that "although Wanda Frazier is not an unfit person to have custody of the minor child, the pres-

ent stability and happiness of this young boy should not be exchanged for the unknown." The court concluded that "there are compelling reasons why this Court should not change the custody of Michael from his grandmother." The court emphasized that in awarding custody to Michael's grandmother it was "not penalizing Wanda Frazier for her live-in relationship."

The mother of Michael appealed to the court of appeals which, relying on this court's holding in *LaChapell v. Mawhinney,* 66 Wis. 2d 679, 225 N.W.2d 501 (1975), affirmed the judgment of the trial court. This court granted a petition for review.

Custody determinations are based on first-hand observation and experience with the persons involved and therefore the discretionary decisions of the trial court are given great weight on appeal. A custody award will be upset only if the appellate court is convinced that the findings of fact upon which the custody determination is based are clearly erroneous, sec. 805.17 (2), Stats. 1980–81, or that the custody determination represents a clear abuse of discretion. To find an abuse of discretion, an appellate court must find either that the circuit court has not exercised discretion or that it has exercised discretion on the basis of an error of law or irrelevant or impermissible factors. *In re Marriage of Millikin v. Millikin,* 115 Wis. 2d 16, 25, 339 N.W.2d 573 (1983) ; *In re Marriage of Gould v. Gould,* 116 Wis. 2d 493, 498, 342 N.W.2d 426 (1984).

In its findings of fact and conclusions of law, the circuit court stated that it was applying the best interests of the child criteria but also stated that there were compelling reasons for not awarding custody of Michael to his mother. We conclude that the "best interests of the child" is not the proper standard in custody disputes be-

tween a natural parent and a third party and also that the record does not support a conclusion of compelling reasons for denying custody to Michael's mother. We therefore reverse the decision of the court of appeals and order that custody be transferred to Wanda Frazier.

A grandparent stands in a closer relationship to a child than one we normally think of as a "third party."[5] But as between a parent and a grandparent we hold that to deprive a parent of custody the principles one would apply to third parties are applicable.

This court has accepted the principle that between parents in a divorce action the "best interest of the child" is generally applied as to which parent is awarded custody. Section 767.24 (2), Stats.; *Johnson v. Johnson,* 78 Wis. 2d 137, 148, 254 N.W.2d 198 (1977).

Transfer of legal custody of a child from a parent to a third party does not have the finality of termination of parental rights. "Custody" may imply a temporary arrangement that theoretically could be changed as future circumstances might warrant. But a change of custody may result in as complete a severance of child-parent ties as does termination. The day to day contact between the child and one having custody can create a relationship that may leave the birth parent almost an intruder. All of the day to day interactions between a parent and child are bound to be diminished if not eliminated where the parent comes on the scene as a court permitted "visitor."

---

[5] Section 48.62, Stats., provides that no person may receive, with or without transfer of legal custody, four or fewer children to provide care and maintenance for those children unless he or she either obtains a license to operate a foster home or is a guardian of the child or a relative as defined in sec. 48.02(15), Stats., or as specified in sec. 49.19(1)(a), Stats. Grandparents are among the relatives named in both sections. *See, Adoption of Randolph,* 68 Wis. 2d 64, 77, 227 N.W.2d 634 (1975) (Day, J., dissenting).

This court has not had many custody cases from which workable principles are easily derived. *Ponsford v. Crute,* 56 Wis. 2d 407, 202 N.W.2d 5 (1972). *LaChapell v. Mawhinney,* 66 Wis. 2d 679, 225 N.W.2d 501 (1975).

Other jurisdictions have had occasion to analyze the legal and social forces at work when courts have been called upon to steer the frail bark of a child's "best interest" through the cross-currents of parent-grandparent relationships, where the whirlpools of love and attachment may pull powerfully in opposite directions. *See* Annot., 31 A.L.R.3d 1187 (1970) and cases cited therein.

When a parent is young, the physical, financial and even emotional factors may often appear to favor the grandparents. One cannot expect young parents to compete on an equal level with their established older relatives.[6] So the "best interest" standard cannot be the test. If it were we would be forced to conclude that only the more affluent in our society should raise children. To state the proposition is to demonstrate its absurdity.

We conclude that in the absence of compelling reasons the principles followed in cases involving termination of parental rights should be followed where a request for a custody change from a parent to a third party is presented to a court.

Both this court and the United States Supreme Court have recognized that the relationship between a parent

---

[6] In a case involving a custody dispute between a child's father and the child's aunt, the Missouri Court of Appeals stated in *Frederick v. Frederick,* 617 S.W.2d 629, 636 (Mo. Ct. App. 1981):

"If the best interest is established by current environment surroundings and future development of the child, and is supported by the comparative financial and social posture of the parties absent any consideration of the biological nexus of parent and child, this court fears a natural parent could never prevail even though he or she possessed the strongest desire to raise, nurture and provide for the child."

and a child is a constitutionally protected right. In *Stanley v. Illinois,* 405 U.S. 645 (1972) the United States Supreme Court considered the constitutionality of an Illinois statutory scheme that permitted the parental rights of an unwed father to be terminated without a determination of his parental unfitness. In that case the unwed parents of three children had lived together intermittently for eighteen years. The mother died. In accordance with Illinois law which provided that children of unwed parents became wards of the state upon the death of the mother, a dependency proceeding was instituted and the children were placed with court appointed guardians. The father challenged the constitutionality of the law under the due process and equal protection clauses of the fourteenth amendment to the United States Constitution. The Supreme Court held that the due process clause requires that a father be given a hearing on his fitness as a parent before his children may be taken from him and that, by denying an unwed father a hearing and extending it to all other parents whose custody of their children is challenged, the state denies him the equal protection of the laws guaranteed by the fourteenth amendment. In regard to the parental interest involved, the Court stated:

"The private interest here, that of a man in the children he has sired and raised, undeniably warrants defence and, absent a powerful countervailing interest, protection. It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.'" 405 U.S. at 651 (*quoting Kovacs v. Cooper,* 336 U.S. 77, 95 (1949) (Frankfurter, J., concurring)).

The United States Supreme Court returned to the question of the constitutional rights of an unwed father over his children in *Quilloin v. Walcott,* 434 U.S. 246 (1978).

In that case the Court considered a challenge to Georgia's adoption laws which were applied to deny an unwed father authority to prevent adoption of his illegitimate child. The child had been in the control and custody of his mother for his entire life. The mother and the child's natural father never married each other or established a home together. When the child was three years old, the mother married another man. Nine years later the mother consented to adoption of the child by her husband, who immediately filed a petition to adopt. The natural father's attempt to block the adoption was denied even though he was not found to be an unfit parent. The father contested the grant of the adoption claiming that unless he was found to be unfit he was entitled to an absolute veto over adoption of his child.

The Supreme Court acknowledged that it had "recognized on numerous occasions that the relationship between parent and child is constitutionally protected. 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.'" 434 U.S. at 255 (*quoting Prince v. Massachusetts,* 321 U.S. 158, 166 (1944)). (Citations omitted.) The Court went on to hold, however, that in the situation presented by that case, where the unwed father had never been a *de facto* member of his child's family and where the effect of permitting the adoption was to keep the child in a family unit which included his natural mother, the due process clause was not violated by denying the father a veto over the child's adoption. The Court stated:

"We have little doubt that the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was

thought to be in the children's best interest.' *Smith v. Organization of Foster Families*, 431 U.S. 816, 862–863 (1977) (Stewart, J., concurring in judgment). But this is not a case in which the unwed father at any time had, or sought, actual or legal custody of his child. Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child had never before lived. Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except [the] appellant [father]. Whatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than that the adoption, and denial of legitimation, were in the 'best interests of the child.' " 434 U.S. at 255.

This court addressed the question of the standard for termination of parental rights in *In Interest of J.L.W.*, 102 Wis. 2d 118, 306 N.W.2d 46 (1981). The illegitimate child whose custody was in dispute in that case had spent all but about four months of his one and one-half years in the actual custody of his maternal aunt. The child's mother had agreed prior to his birth to give him up to her sister to be adopted. However, after the baby was born she changed her mind and decided to keep him. She lived with the child for about four months in Boston but found that she was having a difficult time caring for the child as a single working parent. In need of help, the mother delivered the child to her sister in Milwaukee with the idea that if she was unable to put her life in order to be able to care for the child, she would permit her son to be adopted. Several months later she wrote to her sister explaining that she could not live with the loss of her son and that she would pick him up the following weekend in Milwaukee. She was prevented from doing so when she was involved in an automobile accident. For the next nine months the child remained with his aunt in Milwaukee while his mother lived on the east coast. During this

period the child's mother did not abandon her intention to retrieve the child and make a home with him.

When the child was approximately nineteen months old, the aunt and her husband commenced guardianship proceedings. They were appointed temporary guardians and subsequently petitioned for and were granted an order terminating the mother's parental rights and appointing them permanent guardians of the child. The mother appealed the trial court order arguing that she was denied her constitutional due process rights. This court analyzed the case under the principles announced in *Stanley* and *Quilloin* and concluded that under the facts presented, the mother had to be found unfit before her parental rights could be terminated. Unlike the father in *Quilloin,* the mother of J.L.W. had legal custody of the child until the court ordered otherwise and physical custody for most of the first four months of the child's life. Finally, the *Quilloin* case was distinguished on the ground that in that case the child's existing family unit included his natural mother. This court concluded in *J.L.W.* that the mother's constitutional due process rights were violated by the trial court's termination of her parental rights without finding her unfit.

In the recent case of *Santosky v. Kramer,* 455 U.S. 745 (1982) the United States Supreme Court addressed the question of what standard of proof is required before a state can terminate the parental rights of a natural parent. The Court analyzed the question according to the standards set forth in *Mathews v. Eldridge,* 424 U.S. 319 (1976) and determined that: "In parental rights termination proceedings, the private interest affected is commanding; the risk of error from using a preponderance standard is substantial; and the countervailing governmental interest favoring that standard is comparatively slight." 455 U.S. at 758. The Court concluded that a fair preponderance of the evidence standard is inconsistent

with due process and that "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." 455 U.S. at 747–748.

None of the cases discussed above address the question presented by this case, i.e., the constitutional rights implicated in a custody dispute as contrasted to a termination proceeding between a natural parent and a third party. As was stated in *Santosky v. Kramer,* "[t]ermination denies the natural parents physical custody, as well as the rights ever to visit, communicate with, or regain custody of the child." 455 U.S. at 749. Since the interests at stake in a custody dispute are somewhat less than in a termination proceeding, it would be expected that the constitutional standards would also be somewhat lower.

The United States Supreme Court weighed the constitutional liberty interests of natural parents against a claimed liberty interest of non-parent custodians in *Smith v. Organization of Foster Families,* 431 U.S. 816 (1977). That case involved a challenge brought by an organization of foster families to New York procedures for removal of children who had lived with the family for less than eighteen months. The foster family group claimed that foster families had a constitutional liberty interest in the integrity of their family unit which was insufficiently protected by the state procedures.

The Court first noted that the "usual understanding of 'family' implies biological relationships, and most decisions treating the relation between parent and child have stressed this element." 431 U.S. at 843. However, biological relationship is not solely determinative of the existence of a family. As the Court pointed out, the marriage relationship itself is not a matter of blood relation.

"Thus the importance of the familial relationship, to the individuals involved and to the society, stems from

the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children, *Wisconsin v. Yoder*, 406 U.S. 205, 231–233 (1972), as well as from the fact of blood relationship. No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship." 431 U.S. at 844. (Footnote omitted.)

But the Court went on to point out that there are important differences between the foster family and the natural family. Unlike the foster family which has its source in state law and contractual arrangements, "the liberty interest in family privacy has its source, and its contours are ordinarily to be sought, . . . in intrinsic human rights as they have been understood in 'this Nation's history and tradition.' " 431 U.S. at 845 (*quoting, Moore v. East Cleveland*, 431 U.S. 494, 503 (1977)). Although the Court recognized that liberty interests may in some cases arise from positive-law sources, it concluded that "[w]hatever liberty interest might otherwise exist in the foster family as an institution, that interest must be substantially attenuated where the proposed removal from the foster family is to return the child to his natural parents." 431 U.S. at 846–847.

While neither this court nor the United States Supreme Court has ever addressed the specific question posed by this case, i.e., what the constitution requires in a custody dispute between a parent and a nonparent third party, a number of relevant principles emerge. On the one hand "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their children to the State." *Santosky v. Kramer*, 455 U.S. at 753. On the other hand, it is evident from *Quilloin v. Walcott* and

*Smith v. Organization of Foster Families* that the assertion of parental rights is to some extent dependent on the assumption of parental responsibilities, and that the zone of constitutionally protected family autonomy is not defined solely by genetic ties. A biological parent who has never borne any significant responsibility for the child and who has not functioned as a member of the child's family unit is not entitled to the full constitutional protections. *In Interest of Baby Girl K.,* 113 Wis. 2d 429, 447–448, 335 N.W.2d 846 (1983).

Wisconsin statute and case law is consistent with the constitutional principles stated above. The statutory provision governing child custody is contained in sec. 767.24, Stats. Counsel for Ms. Frazier argues that sec. 767.24 (1)(c), prohibits the court from awarding custody to a nonparent unless the court finds the parents to be either unfit or unable to care of the child. That subsection provides:

> "767.24  Child custody. . . . (c) If the interest of any child demands it, and if the court finds that neither party is able to care for the child adequately or that neither party is fit and proper to have the care and custody of the child, the court may declare any such child to be in need of protection or services and transfer legal custody of the child to a relative of the child, as defined in s. 48.-02(15), to a county agency specified in s. 48.56(1) or to a licensed child welfare agency. The charges for such care shall be pursuant to the procedure under s. 48.36 except as provided in s. 767.29(3)."

It is argued that the word "party" in the statute refers to the child's parent. Support for this reading is found in sec. 767.24(1), which directs the court to "make such provision as it deems just and reasonable concerning . . . the *minor children of the parties.*" (Emphasis added.) Counsel argues that it is parents, not parties, who have

children and that the meaning of the term "parties" in sec. 767.24(1), controls the meaning of the term "party" in sec. 767.24(1)(c). We disagree. Prior to 1979 the comparable provision of the child custody statute used the term "parents" where "party" now appears. *See* sec. 247.24(1)(c), Stats. 1977. In 1979 the language of the statute was amended to its present form. Chapter 196 Laws of 1979. The legislature would not have changed the wording of the statute from parents to party if it intended that party be understood to only mean parent. Furthermore, the present wording of the law is consistent with the fact that the section applies not only to custody disputes arising from actions for annulment, divorce, or legal separation but also to custody actions under sec. 767.02(1)(e), where, as here, one or both of the parties seeking custody may not be the child's natural parent. The evident purpose of sec. 767.24(1)(c), is to permit a court to declare a child to be in need of protective services only if it finds that the best interests of the child demand it and that neither party seeking custody is able to care for the child adequately or that neither party is a fit or proper custodian.

The statutory standards for child custody do not establish an absolute right of a fit and able parent to the custody of his or her children in the face of compelling reasons to the contrary. The statutes do require, however, that the parents' wishes as to custody be taken into consideration. The general rule regarding custody determinations is stated in sec. 767.24(2), Stats.:

"**Child custody.** . . . (2) In making a custody determination, the court shall consider all facts in the best interest of the child and shall not prefer one potential custodian over the other on the basis of the sex of the custodian. The court shall consider reports of appropriate professionals where admitted into evidence when custody is contested. The court shall consider the following factors in making its determination."

Among the factors to be considered are: "(a) The wishes of the child's parent or parents as to custody;" and "(b) The interaction and interrelationship of the child with his or her parent or parents, siblings, and any other person who may significantly affect the child's best interest." Thus the statute recognizes both the parental interest in directing the child's upbringing and the relationship the child has with his parents and others.

Wisconsin case law involving custody disputes between parents and third parties similarly recognizes that parents have a preeminent right to the custody of their children absent a finding of unfitness, inability or compelling reasons due to dissolution of the parent-child relationship or dereliction of parental responsibilities. *Ponsford v. Crute*, 56 Wis. 2d 407, 202 N.W.2d 5 (1972) involved a custody dispute between a natural father and the maternal grandparents of a small child. The parents of the child had separated prior to the time the baby was born. When the baby was approximately six months old, she was taken by her mother to the home of her mother's parents where the two remained until the mother died when the child was about one and one-half years old.

Meanwhile the father had been drafted for military service. When he learned of his wife's death, he received an emergency furlough and returned to Wisconsin for the funeral services. After the funeral, the father told the grandparents that he wanted to take the child back with him. The grandparents refused. Thereupon the father commenced a *habeas corpus* proceeding to obtain custody of his daughter. The court denied the petition for the writ. Shortly thereafter the father remarried and about six months later he received an honorable discharge from the military. During the time the child was living with her grandparents, the father traveled five or six times from his home in Ohio to northern Wisconsin to visit his daughter. He also paid most of the sixty dollars per

month support payments as required by the separation agreement.

When the child was approximately four years old, the father brought a custody action in circuit court. The circuit court ordered custody transferred from the grandparents to the father. The grandparents appealed. This court, relying on the predecessor to the current child custody statute[7] affirmed the trial court stating: "[A]s between . . . the natural father and . . . the maternal grandparents [the natural father] cannot be deprived of the custody of his minor child unless there is a finding that either he is unfit or is unable to care for the child." 56 Wis. 2d at 413.

This court returned to the question of the proper standard for resolving custody disputes between natural par-

---

[7] Section 247.24, Stats. 1969, provided:

"247.24. **Judgment, care and custody, etc., of minor children.** In rendering a judgment of annulment, divorce or legal separation, the court may make such further provisions therein as it deems just and reasonable concerning the care, custody, maintenance and education of the minor children of the parties, and give the care and custody of the children of such marriage to one of the parties to the action, or may, if the interest of any such child demands it, and if the court finds either that the parents are unable to adequately care for any such child or are not fit and proper persons to have the care and custody thereof, may declare such child a dependent and give the care and custody of such child to a relative (as defined in ch. 48) of the child, a county agency specified in s. 48.56(1), a licensed child welfare agency, or the department of health and social services. The charges for such care shall be pursuant to the procedure under s. 48.27. Whenever the welfare of any such child will be promoted thereby, the court granting such judgment shall always have the power to change the care and custody of any such child, either by giving it to or taking it from such parent, relative or agency, provided that no order changing the custody of any child shall be entered until after notice of such application has been given the parents of such child, if they can be found, and also to the relative or agency that then has the custody of such child."

ents and third parties in *LaChapell v. Mawhinney*, 66 Wis. 2d 679, 225 N.W.2d 501 (1975). The children involved had been placed in the custody of their mother following her divorce from their father. Eight years later the mother died, whereupon the maternal grandparents of the children brought an action for their custody. The trial court, following the rule stated in *Ponsford v. Crute*, found the father to be presently fit and able and awarded custody to him.

The grandparents appealed to this court which reversed. This court found the facts of the case "substantially" different from the facts in *Ponsford v. Crute*. In the eight years between the time of the divorce and the mother's death, the father had visited his children only twice. The trial court had found that prior to the mother's death, the father had abandoned the children, had failed to provide necessities for them, and that he had failed to display any interest whatsoever in the children. In holding that custody should be awarded to the children's grandparents, the court stated:

"The conclusion reached by this court in *Ponsford* should not be interpreted as laying down an inflexible rule, that in every case involving a dispute between the natural father or mother and grandparents for the custody of the children, the doctrine of the best interests of the children cannot prevail. As a general matter, but not invariably, the child's best interest will be served by living in a parent's home. However, if circumstances compel a contrary conclusion, the interests of the child, not a supposed right of even a fit parent to have custody, should control." 66 Wis. 2d at 683.

Under ordinary circumstances, a natural parent has a protected right under both state law and the United States Constitution to rear his or her children free from governmental intervention. Absent compelling reasons narrowly defined, it is not within the power of the court

to displace a fit and able parent simply because in the court's view someone else could do a "better job" of "parenting."

A parent's claim to custody is an independent interest and not a "mere derivation of what the interests of the child require."[8] However, parental rights do not exist solely for the benefit of the individual parent but exist also and perhaps most importantly for the benefit of the family unit of which the parent is a part. The import of the United States Supreme Court decisions in this area is to create a "private realm of *family life* which the state cannot enter." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). (Emphasis added.) The law casts its protection around the family unit. It follows therefore that what are called parental "rights" are both rights and responsibilities, and that a neglect of one's responsibilities can result in a forfeiture of one's rights. When a parent asserts rights in a family unit for which he has taken no responsibility and in which he has shown no interest, the force of the parent's claim is considerably weakened. Under such circumstances, it is appropriate to recognize a family unit which does not include the natural parent.

We conclude that the rule to be followed in custody disputes between parents and third parties is that a parent is entitled to custody of his or her children unless the parent is either unfit or unable to care for the children or there are compelling reasons for awarding custody to a third party. Compelling reasons include abandonment, persistent neglect of parental responsibilities, extended disruption of parental custody, or other similar extraordinary circumstances that would drastically affect the welfare of the child. If the court finds such compelling

---

[8] Strauss & Strauss, Book Review, 74 Colum. L. Rev. 996, 1001 (1974) (J. Golstein, A. Freud & A. Solnit, *Beyond The Best Interests Of The Child*).

reasons, it may award custody to a third party if the best interests of the children would be promoted thereby.[9] *See, Bennett v. Jeffreys,* 40 N.Y.2d 543, 387 N.Y.S.2d 821, 356 N.E.2d 277 (1976).

In this case the trial court found Wanda Frazier to be both fit and able to have the care and custody of Michael. That finding is supported by the record. Therefore the trial court's judgment can be upheld only if there are compelling reasons justifying an award of custody to Theol Barstad.

Wanda Frazier has maintained a continuous relationship with Michael throughout the child's life. Indeed, during most of the eight years between Michael's birth in 1973, and the custody hearing in 1981, mother and son lived together as a part of a single family unit. The periods of separation do not reflect a neglect on Wanda Frazier's part of parental responsibilities or lack of interest in the child's welfare. They reflect rather the efforts of a very young mother to establish her own home which included her son.[10]

---

[9] We are not, contrary to the assertion of the dissent, holding that parents may be deprived of custody of their children only if they are found to be unfit. (Dissenting opinion at p. 583). A complete failure to assume any significant responsibility for the child such as was the case in *Lehr v. Robertson,* —— U.S. ——, 103 S. Ct. 2985 (1983) cited by the dissent, may well constitute compelling reasons warranting an award of custody to a non-parent. As stated below, there is no such failure to assume her responsibility as a parent by Wanda Frazier in this case.

[10] The dissent bases its argument on its conclusion that "Michael's mother has not borne a significant responsibility for Michael and has not consistently functioned as a member of the child's family unit. . . ." (Dissenting op. at p. 574). This conclusion is not supported by the record. The fact is that during most of Michael's life prior to the commencement of this lawsuit, Michael lived in the same household with his mother. As stated above (*Supra* at p. 551.) Wanda Frazier was sixteen years old and living with her father at the time Michael was born. Shortly thereafter, *both* Michael and his mother began living with Theol Barstad.

We conclude that the facts of this case do not evidence compelling reasons for an award of custody to Michael's grandmother. Therefore the decision of the court of appeals is reversed and custody of Michael Frazier is ordered transferred to his mother Wanda Frazier.

*By the Court.*—The decision of the court of appeals is reversed; the judgment of the circuit court is reversed.

SHIRLEY S. ABRAHAMSON, J. (concurring). I concur in the mandate. The circuit court order should be reversed. The circuit court did not apply the statutory "best interests of the child" standard giving appropriate weight in this case, as the statute directs, to the wishes of

Except for the period of Wanda Frazier's involuntary separation from Michael since the commencement of this lawsuit, Michael has lived with his grandmother and apart from his mother for only about two and one-half years. Clearly during most of the time Michael was living with his grandmother he was also living with his mother.

The trial court made no findings as to who took responsibility for the care of Michael. The dissent's discussion of the testimony as to who was involved in the daily care of Michael during the time he was living with his mother at his grandmother's house is misleading. The dissent states: "[D]uring that period of time, the mother worked nights and she testified that she saw Michael only for an hour a day in the morning before he went to school and during weekends." (Dissenting op. at p. 571). It is true that Ms. Frazier testified that when she worked nights she was only able to see Michael in the mornings and on weekends. There is no support in the record for the dissent's assertion that she was working nights the whole time. In fact Ms. Frazier testified: "When I wasn't working, I was home with Mike." Wanda Frazier testified that she attended Michael's parent-teacher conference when he was in the second grade. The dissent states that "[t]he grandmother testified that she attended the balance of such meetings." (Dissenting op. at p. 572). There is no evidence in the record as to how many meetings this "balance" was. Finally, Wanda Frazier expressly denied that Mrs. Barstad had been primarily responsible for parenting Michael.

the child's parent or parents as to custody. Sec. 767.24 (2) (a), Stats. 1981–82. I do not join the majority in reaching out and addressing constitutional issues not necessary to the decision of the case.

STEINMETZ, J. (dissenting). First, it must be stated what the facts of this case do not deal with and that is the termination of Michael's mother's parental rights. This case concerns a grandmother, the plaintiff, who is seeking the legal custody of her grandson, Michael.

According to the testimony of Theol A. Barstad, the grandmother, and Wanda K. Frazier, the mother of Michael, the boy was born on November 24, 1973, and has lived outside of the grandmother's home for only six months, except for the time after birth when he lived with his mother and her father for about two months and with his mother and her brother for less than a month. Michael was approximately eight years of age at the time of the custody hearing on December 21 and 30, 1981, and is now about ten and one-half years. During his eight years he has:

(1) lived outside of the grandmother's house for approximately six months;

(2) lived in the grandmother's house with his mother also living there for approximately four and one-half years;

(3) lived in the grandmother's house while his mother lived elsewhere for close to three years.

He has now lived in his grandmother's house without his mother living there since April, May or June of 1980.

The parties differed in their testimony as to who was involved in the daily care of Michael while they all lived in the grandmother's house. However, during that period of time, the mother worked nights and she testified that she saw Michael only for an hour a day in the morning before he went to school and during weekends. The

grandmother testified that from February, 1974, to February, 1977, she was primarily responsible for meeting Michael's physical needs and that from August, 1977, to the time of the hearing, she and her husband had been primarily responsible for raising Michael and meeting his physical needs. Michael's mother admitted to attending only one parent-teacher conference at his school. The grandmother testified that she attended the balance of such meetings.

Footnote 10 in the majority opinion discusses a different conclusion than mine as to what the record bears on the mother's continuing relationship with Michael. The record on this issue consists of the mother and grandmother's testimony and in some respects they are at odds with each other. That is a strong reason for affirming the trial court unless the trial judge abused his discretion, which in my opinion he did not do here. The trial judge heard and saw the witnesses and had the opportunity to develop the evidence to a greater degree if he believed he needed more information. As an appellate court we are not in such a favored position to evaluate the testimony since we have only a record which is sometimes short of what we wish as to convincing power.

There is nothing at all in the record of the daily and hourly togetherness of Michael and his mother when they both lived in the grandmother's house since the only testimony on the mother's working hours was from the mother and the grandmother as to working nights. If she had other working hours and conditions during that time, she did not testify to them. This again is a strong reason for affirming the trial judge absent an abuse of discretion which is not found here by the majority. The record does not show how many parent-teacher conferences the grandmother attended for Michael but only that she attended all of them except the one attended by his mother.

According to the trial court's findings, the result of having spent all of his life but approximately six months in his grandmother's house and under her immediate, even though not exclusive, care is that Michael is a happy, bright, friendly, intelligent and well-adjusted boy who is doing well in school and is happy in his present surroundings, his grandmother's home.

Since this is a custody case and not termination of parental rights case, *Stanley v. Illinois,* is not relevant. In the portion of that case quoted by the majority (*supra* at p. 557), the Supreme Court described the child's father as not only having sired but "raised" the child. We do not have a mother in the instant case who has raised her child.

*Quilloin v. Walcott,* cited by the majority, arose under a Georgia law which required consent by a parent for adoption of a child born out of wedlock. The Supreme Court, however, denied the father's attempt to block the adoption. The court stated in *Quilloin* that since the father had never been a *de facto* member of his child's family, he was not denied due process by not allowing him a veto over his child's adoption. The statements of the Court in *Quilloin* regarding the rights of parents were directed to a "natural family" and in that situation unfitness of a parent was necessary before breaking up the natural family. In the instant case, Michael has lived with his "natural family," which is his grandmother, for all but approximately six months of his entire life. The *Quilloin* case was decided on the rule of the best interest of the child.

In the *In Interest of J.L.W.* case, termination of parental rights of the mother was at issue. There this court required a finding of unfitness of the mother before her parental rights could be terminated. Again, since that case concerns the termination of parental rights, it is not relevant to the present custody case.

*Smith v. Organization of Foster Families* did not involve the issue of weighing the rights of natural parents as against foster parents, nor did it involve a custody or termination issue. The foster parents organization challenged New York procedures for removal of children who had lived with the foster family for less than 18 months. These foster families claimed a constitutional liberty interest in the integrity of their family unit. It is in that atmosphere that the Supreme Court upheld New York's procedures and described family values as follows:

"Thus the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children, *Wisconsin v. Yoder*, 406 U.S. 205, 231–33 (1972), as well as from the fact of blood relationship. No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship." 431 U.S. at 844. (Footnote omitted.)

Regarding *In Interest of Baby Girl K.*, 113 Wis. 2d 429, 447–48, 335 N.W.2d 846 (1983) the majority states: "A biological parent who has never borne any significant responsibility for the child and who has not functioned as a member of the child's family unit is not entitled to the full constitutional protections." (*Supra* at p. 563.) Michael's mother has not borne a significant responsibility for Michael and has not consistently functioned as a member of the child's family unit, and yet the majority applies an unfitness of parent test rather than in the best interest of the child test.

The majority states: "The statutory standards for child custody do not establish an absolute right of a fit and able parent to the custody of his or her children in the face of compelling reasons to the contrary." (*Supra* at p. 564.) Then the majority cites sec. 767.24 (2), Stats.:

" '767.24 **Child custody.** . . . (2) In making a custody determination, the court shall consider all facts in the best interest of the child and shall not prefer one potential custodian over the other on the basis of the sex of the custodian. The court shall consider reports of appropriate professionals where admitted into evidence when custody is contested. The court shall consider the following factors in making its determination.' " (*Supra* at p. 564.)

That section states the legislature's determination that in child custody cases the test is the best interest of the child. Paternity would only be one, but important, fact in applying that test for custody.

The majority ignores the legislative pronouncement in sec. 767.24(1)(c), Stats., which is that the best interest of the child is the appropriate test in a custody award and not the unfitness test. That section states the test as "If the interest of the child demands it," which is always the paramount test. Section 767.24(1)(c) speaks to applying the best interest of the child test only if both parties in the action are unfit or unable to adequately care for the child before awarding custody to a relative of the child based on the child's best interest. In that circumstance, there is no alternative but to look to the best interest of the child. However, in the instant case neither party has been found unfit, but that does not eliminate the test of best interest of the child. It is unnecessary and in fact unwise to find the mother unfit and therefore not able to participate in any way with the raising of her son. By awarding custody of the boy to the grandmother, the trial court did not foreclose contact with the mother on a daily or regular basis which a finding of unfitness might have brought about.

In *Larson v. Larson*, 30 Wis. 2d 291, 299, 140 N.W.2d 230 (1966), we stated:

"A court should not necessarily feel impelled to make a finding of unfitness on the part of the mother when it has

determined that the best interests of the child demand its custody be placed in the father. . . . In many instances the mother can be a fit person to have the custody, but because of other comparative circumstances custody to the father serves the best interest of the child."

The trial court should not be required to find the parent unfit before considering the best interests of the child since that is not in the child's best interest. If the parent is found by a court to be unfit, his or her parental rights should be terminated. If the parent is not unfit, he or she still may not be the person to have custody of the child when considering the child's best interest.

Section 767.24(2), Stats., controls when making a custody determination and the test there is the best interest of the child. That section now sets forth the factors the trial court shall consider in making the determination and they are:

"(a) The wishes of the child's parent or parents as to custody;
"(am) The wishes of the child as to his or her custody;
"(b) The interaction and interrelationship of the child with his or her parent or parents, siblings, and any other person who may significantly affect the child's best interest;
"(c) The child's adjustment to the home, school, religion and community;
"(d) The mental and physical health of the parties, the minor children and other persons living in a proposed custodial household;
"(e) The availability of public or private child care services; and
"(f) Such other factors as the court may in each individual case determine to be relevant."

Unfitness is not defined in the statutes. In a concurring opinion in *LaChapell v. Mawhinney*, 66 Wis. 2d 679 at 685–86, Chief Justice Horace Wilkie gave a relevant definition of unfitness in a custody matter. He stated:

"Unfitness is more than a matter of 'morals.' As a matter of fact, the statute dealing with care and custody of minor children describes unfitness in these terms:

"'247.24 . . . if the court finds either that the parents are unable to adequately care for any such child or are not fit and proper persons to have the care and custody thereof, . . .'

"Fitness then is measured in terms of ability to adequately care for a child."

"Adequately" is a term that suggests there are relatively different modes of care. Funk & Wagnall's Desk Standard Dictionary gives "adequate" a range of meaning from "equal to what is required" or "suitable to the case or occasion" or "fully sufficient." In raising a child, minimal capacity for care and treatment must be examined in light of the best interest of the child if there is superior care and treatment available, especially if the superior care is provided by and available from a custodian who has proven as successful at it as the grandmother has in respect to Michael.

In *Dees v. Dees,* 41 Wis. 2d 435, 440, 164 N.W.2d 282 (1969), the court discussed unfitness as follows:

"Actually, there is an understandable reluctance of family courts to pronounce a parent to be 'unfit.' . . . In jurisdictions where children are still treated as near-chattels in a comparing of respective rights of parents to custody, this distinction between unfitness and inability to adequately provide care may be very important. In this state, where the primary and controlling consideration is what will be best for the child it is not as crucial because in this state the would-be custodian must establish not only fitness and ability to provide adequate care but also that his or her being awarded custody would be in the best interests of the child. This court has held that a mother can be a fit person to have the custody '. . . but because of other comparative circumstances custody to the father serves the best interests of the child' also suggesting that 'A court should not necessarily feel impelled to make a finding of unfitness on the

part of the mother when it has determined that the best interests of the child demand its custody be placed in the father.' Under the 'comparative circumstances' test, we deal not in the coin of censure or blame, but in the concentration of concern on what order will best protect and promote the well-being of the child."

If as between parents, one need not be found unfit before custody is awarded based on the child's best interest, the same should hold true where as here the grandmother seeks custody. Unfitness conclusively rules out the parent as a custodian but that finding should not be required since it is the child's best interest that should be controlling.

Again, what the court in this case is not considering must be discussed since the majority's opinion raises the specter of lifestyle, finances and the omnipresent state. The plaintiff in the present case, the grandmother, receives Aid for Dependent Children to support Michael. Therefore, the majority's fear of the wealthy prevailing if the best interest of the child test is applied is unfounded in this case. When the situation arises that there is a contest between wealth of a third party and the minimal financial ability of a parent, then the trial court can address it, and it is doubtful whether any trial judge in this state would award custody on the basis of wealth. This mother is supported by her male friend with whom she lives. He has not been employed since August, 1981, and lives on separation funds. This man has no legal obligation to support either Michael or his mother and the relationship can end anytime he chooses. Therefore, the decision of the trial court did not involve financial advantage of minimum economic circumstances.

The only consideration of lifestyle applied by the trial judge in this case concerned the stability of the boy's environment. For ten years the grandmother has provided a stable home environment on which Michael can

depend. The mother is now approximately 26 years of age and has not yet demonstrated a continuing stable lifestyle. It is that factor of uncertainty which the trial judge compared to the boys' present stable environment in determining his best interest. Since leaving her mother's house in June of 1980, the mother of Michael has lived from June, 1980, to July, 1980, in River Falls, Wisconsin; July, 1980, to February, 1981, in Woodbury, Minnesota; February, 1981, to September, 1981, in Stillwater, Minnesota; and September, 1981, to December, 1981, in South Haven, Minnesota.

This is not a case where the state is involved as it would be in a termination of parental rights matter and so discussing the oppressiveness of a "1984"[1] style action is not relevant. In termination cases, the statutes and this court have stated fitness is the criterion. Although, in the recent termination case of *In Interest of Baby Girl K.,* this court stated, consistent with the United States Supreme Court cases, that the best interest of the child in a termination case is paramount since in that case the father's rights were terminated due to his lack of care of the child when the opportunity was available and that was sufficient for an unfitness finding.

The United States Supreme Court in *Lehr v. Robertson,* —— U.S. ——, 103 S. Ct. 2985, 2992 (1983), analyzed many of its previous custody cases. The *Lehr* decision repeated the language of a concurring opinion in *Smith v. Organization of Foster Families,* 431 U.S. 816, 862, citing *Caban v. Mohammed,* 441 U.S. 380, 397 (1979): " 'Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.' 441 U.S., at 397, 99 S. Ct., at 1770."

In *Lehr,* 103 S. Ct. at 2993, the Court discussed *Stanley v. Illinois* and *Quilloin v. Walcott* and *Caban v. Moham-*

---

[1] The book by George Orwell.

*med,* and what it stated concerning unwed fathers can be applied generally to biological parents:

"[T]he mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds. '[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot[ing] a way of life" through the instruction of children as well as from the fact of blood relationship.' "

The Court was quoting *Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 844, which quoted *Wisconsin v. Yoder,* 406 U.S. 205, 231–33 (1972).

The Supreme Court in *Lehr* concluded:

"The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie." 103 S. Ct. at 2293–94.

The same analysis can be applied to the mother of a child even though the U.S. Supreme Court cases have dealt with fathers. The mother of Michael has had ten and one-half years to be involved in the daily raising and care of her son and has not consistently and constantly done so. Therefore, Michael's excellent attitude toward life and his hope for the future are owed principally to his grandmother's ten years of caring for him and caring about him. The trial court recognized the stability in Michael's life and said it should not be foregone for the uncertainty of the next eight years in the custody of his

mother who still has not developed a stable lifestyle, but rather one subject to constant change.

As the Court stated in *Lehr:* "The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility. It is self-evident that they are sufficiently vital to merit constitutional protection in appropriate cases." *Id.* at 2990. The Court described those appropriate cases to be where the parent has been involved in the daily raising and care of the child, which we do not have in the instant case. That court also considered the age of the child as a factor to be considered since what might be in the best interest of an infant or toddler may not be in the best interests of a ten year old child as is the situation in this case.

Annot., 31 A.L.R. 3d 1187, 1196 (1970), Child Custody—Parent or Grandparent, discusses the two basic principles in determining custody as:

(1) the parental right doctrine and

(2) and the best interests of the child concept.

The article states that:

"The conflict between these two basic theories is more apparent than real, since even those courts which tend to apply the 'best interests of the child' doctrine firmly support the proposition that one of the most important factors entering into the determination as to what constitutes the best interest of the child is the general belief that normally it is in the child's best interest to be in the custody of its parents as distinguished from the custody of a grandparent. Moreover, the two doctrines are not always clearly distinguished in the opinions, and in many instances both doctrines seem to have been utilized by the courts, such interchangeability probably being due to the fact that both doctrines seek the same basic objective from two different approaches."[2]

---

[2] For analysis of the confusion in this court's decisions as to termination and custody, *see:* Hayes and Morse, *Terminating Parental Rights,* 66 Marq. L. Rev. 439 (1983); Cooper and Nelson, *Adoption and Termination: A Reply,* 66 Marq. L. Rev. 641 (1983).

The concept of requiring a finding of unfitness of a parent in a custody case before considering the best interest of a child is out of place. "The use of an unfitness standard has not added noticeable clarity or certainty to custody law and carries with it implications of immorality and fault . . . ." Cooper and Nelson, *Adoption and Termination: A Reply,* 66 Marq. L. Rev. 641, 667 (1983).

In *LaChapell,* 66 Wis. 2d at 683, this court discussed *Ponsford v. Crute,* 56 Wis. 2d 407, 202 N.W.2d 5 (1972) as follows:

"In determining that custody of the two children here should be granted to William Mawhinney, the trial court felt that under *Ponsford v. Crute* (1972), 56 Wis. 2d 407, 202 N.W.2d 5, it had no choice but to award custody to the surviving natural parent unless it could find him to be unfit or unable to care for the children. We do not agree. The conclusion reached by this court in *Ponsford* should not be interpreted as laying down an inflexible rule, that in every case involving a dispute between the natural father or mother and grandparents for the custody of the children, the doctrine of the best interests of the children cannot prevail. As a general matter, but not invariably, the child's best interest will be served by living in a parent's home. However, *if circumstances compel a contrary conclusion, the interests of the child, not a supposed right of even a fit parent to have custody, should control.* There well may be cases where it would be detrimental to the best interests of the child to award custody to a surviving spouse." (Emphasis added.)

In the *LaChapell* case the children whose custody was under consideration were approximately thirteen and ten years old and they hardly knew their father.

The history in custody case law and the test to be applied has vacillated in Wisconsin as follows:

In *Sommers v. Sommers,* 33 Wis. 2d 22, 146 N.W.2d 428 (1966), the unfitness standard was applied.

In *Dees v. Dees,* 41 Wis. 2d 435, 164 N.W.2d 282 (1969), the best interest standard was applied.

In *Ponsford v. Crute,* 56 Wis. 2d 407, 202 N.W.2d 5 (1972), the unfitness standard was applied.

In *Kurz v. Kurz,* 62 Wis. 2d 677, 215 N.W.2d 555 (1974), this court distinguished between the test of *Ponsford* and *Dees.*

In *LaChapell v. Mawhinney,* 66 Wis. 2d 679, 225 N.W. 2d 501 (1975), the best interest of the child standard was applied.

Now, the majority's opinion requires an unfitness test prior to best interest consideration. In 1977 in ch. 105, sec. 37, Laws of 1977, the current sec. 767.24(2), Stats., was adopted. This more recent change does not limit the best interest test to a parent/parent dispute and sets forth the guidelines to be followed in applying the best interest standard. Those are the guidelines that are to be used in determining custody with parental relationship being recognized in sub. (a) : "The wishes of the child's parent or parents as to custody; . . . (b) The interaction and interrelationship of the child with his or her parent or parents, siblings, and any other person who may significantly affect the child's best interest; (c) The child's adjustment to the home, school, religion and community; . . . (f) Such other factors as the court may in each individual case determine to be relevant." All of the subsections may in fact involve a parental relationship in the custody consideration.

It is not informative, realistic or proper in a custody case to require the trial court to find unfitness of the parent or parents prior to applying the truly pertinent standard of what is in the best interest of the child. Parental relationship will certainly be a heavily weighted factor unless other compelling circumstances as determined by the trial court require custody to be granted to another person or persons as in the best interest of the child.

In another law review article, the same conclusion is reached to eliminate presumptions or preferences in custody cases and give "real credence" to the best interest rule. In *The Best Interest of the Child Doctrine in Wisconsin Custody Cases,* Comment, 64 Marq. L. Rev. 343, 359 (1980), the author wrote:

"By this time, it should be clear that a combination of a doctrine declared to be absolutely governing and a presumption or preference which weakens that doctrine can only lead to a morass of muddled rationalizations. Ironically, all of the decisions reached could have been achieved without the imposition of any presumptions or preferences at all. Given the rhetoric found in each case which praises the best interest doctrine, such could easily have been the sole rule in each case without disturbing the result. Eliminating the presumptions and preferences and giving real credence to the best interest rule may not add to the substance of custody law, but it would serve to rid the law of an unnecessary stumbling block, to promote a clarity of language in both trial court and appellate decisions, and perhaps to foster closer examination of the particular circumstances in any given case; an approach which common sense dictates as the most sound."

It must be stressed that custody is not the same as termination of parental rights. If the grandmother of Michael were awarded legal custody, the status quo of the last ten years would be maintained. The mother of Michael would be able to be with Michael daily or visit him with regularity or engage in activities with him. These same contacts might not be available if the mother's rights were terminated but that would depend on the courts' orders for the best interests of the child.

In footnote 9 of the majority opinion, the court states that if there are compelling reasons warranting an award of custody to a nonparent, then the issue of parental fitness or unfitness does not control. That test still establishes the parental fitness question as the controlling one

unless there are compelling reasons to go beyond it in the trial court's consideration. I would find such compelling reasons to be the best interest of the child, as was found by the trial court. Again, the court through this opinion does not give a clear statement of whether the test of fitness must be met before the best interest test is applied.

The trial court found Michael's mother not unfit; however, that did not resolve the case since the judge believed the best interest of Michael was in the custody of his grandmother. I would affirm the trial court and would not require a finding of unfitness of the parent before awarding custody to the grandmother, which is in Michael's best interest. By removing this first unrealistic requirement in the proceedings, which the majority opinion requires, responsibility for the awesome decision would then be placed in the trial court where it belongs. As we said in *In Matter of Adoption of R.P.R.*, 98 Wis. 2d 613, 618, 297 N.W.2d 833 (1980), by quoting *Adoption of Randolph*, 68 Wis. 2d 64, 74–75, 227 N.W.2d 634 (1975):

" 'In questions involving the determination of what is in the best interests of the children, whether in an adoption case or a divorce case, it must be recognized that the trial court has the chance to observe the conduct and demeanor of the witnesses, and its determination of the question of what is in the best interests of the children may not easily be overturned by this court. Thus, in *Larson v. Larson*, [30 Wis. 2d 291 (1966)] a divorce case, we said:

" ' "This court is firmly committed to the principle that the findings of fact and orders of the trial court concerning the custody of minor children in divorce actions will not be set aside or reversed unless clearly against the great weight and clear preponderance of the evidence, or unless there is a clear abuse of discretion.

" ' "Custody matters are highly discretionary and the rule is well established that the trial court's determination will not be upset in the absence of a clear abuse of

discretion." *Belisle v. Belisle* (1965), 27 Wis. 2d 317, 321, 322, 134 N.W.2d 491.

" ' "As has been repeatedly held by this court, the matter of the custody of children in divorce actions is a matter peculiarly within the jurisdiction of the trial court, who has seen the parties, had an opportunity to observe their conduct, and is in much better position to determine where the best interests of the child lie than is an appellate court." *Adams v. Adams* (1922), 178 Wis. 522, 525, 190 N.W. 359; *Hamachek v. Hamachek* (1955), 270 Wis. 194, 202, 70 N.W.2d 595.' "

If the majority is not giving primacy to the fitness test, then the opinion does not explain how the trial judge abused his discretion. I read the opinion to hold that the test in a custody case between parent and grandparent to be whether the parent is fit or unfit to give care to the child and if fit, will be awarded custody except for compelling reasons which will be determined on a case by case basis. It would be better to acknowledge the test to be the best interest of the child with the fitness of the parent being a most important factor. This decision does not state the trial judge abused his discretion and therefore it must mean he applied the wrong test, *i.e.*, parental fitness rather than best interest of the child.

By applying the standard I believe proper of what is in Michael's best interest as a happy, well-adjusted ten year old boy living in a stable environment, I would find the trial court did not abuse its discretion in awarding Michael's custody to his grandmother. " ' ". . . This court will not find an abuse of discretion if the record shows that discretion was in fact exercised and if the record shows that there is a reasonable basis for the trial court's determination." ' " *In Matter of Adoption of R.P.R.*, 98 Wis. 2d at 619, quoting *Rhodes v. Terry,* 91 Wis. 2d 165, 176, 280 N.W.2d 248 (1979). I would find no abuse of discretion in this case and would affirm the trial court.

I am authorized to state that Justice LOUIS J. CECI joins in this dissenting opinion.