IN the INTEREST OF CARYN A.-G., a person Under the Age of 18:

RICHARD D. and Sally D., Appellants,

v.

REBECCA G. and State of Wisconsin, Respondents.†

Court of Appeals

*No. 99–0433. Submitted on briefs May 17, 1999.—Decided June 8, 1999.*

(Also reported in 599 N.W.2d 90.)

†Petition to review denied.

On behalf of the appellants, the cause was submitted on the briefs of *Stephen W. Hayes* and *Susan E. Lovern* of *von Briesen, Purtell & Roper, S.C.*, of Milwaukee.

On behalf of the respondent Rebecca G., the cause was submitted on the brief of *Paulette P. Dowling* and *Stephanie R. Benske* of *Dowling & Felber, S.C.*, of Milwaukee.

On behalf of the respondent State of Wisconsin, the cause was submitted on the brief of *E. Michael Mc Cann*, district attorney, and *Linda M. Johnson*, assistant district attorney.

A Guardian ad Litem brief was filed for the child by *Ira B. Bordow* of *Bordow Law Offices* of Milwaukee.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

FINE, J. This is a dispute between Rebecca G., the birth-mother of Caryn A.-G., and Richard and Sally D., Caryn's foster parents. In November of 1996, the children's court entered an order finding that Caryn, who had been living with Mr. and Mrs. D. since April of 1995, was a child in need of protection or services under § 48.13(10), STATS. (a child "[w]hose parent, guardian or legal custodian neglects, refuses or is unable for reasons other than poverty to provide necessary care, food, clothing, medical or dental care or shelter so as to seriously endanger the physical health of the child"). In October of 1998, just before the order, already extended once, was to expire, the State of Wisconsin filed a petition seeking to have it extended again. The State's petition also asked that Caryn stay with Mr. and Mrs. D. In December of 1998, the trial court held an evidentiary hearing on the petition under § 48.64(4)(c), STATS.[1] At the conclusion of the four-day hearing, the trial court extended the order and, contrary to the State's recommendation, decided that Caryn should be taken from the D.s' home and placed with Rebecca G.

---

[1] Section 48.64(4)(c), STATS., provides:

> The circuit court for the county where the child is placed has jurisdiction upon petition of any interested party over a child who is placed in a foster home, treatment foster home or group home. The circuit court may call a hearing, at which the head of the home and the supervising agency under sub. (2) shall be present, for the purpose of reviewing any decision or order of that agency involving the placement and care of the child. If the child has been placed in a foster home, the foster parent may present relevant evidence at the hearing. The court shall determine the case so as to promote the best interests of the child.

Mr. and Mrs. D. appeal.[2] We reverse and remand for further proceedings.[3]

This case involves one of the classic conflicts of our era: when may government intervene in the relationship between a birth-parent and child, and, if intervention is warranted, what factors control whether the birth-parent will lose some or all rights to his or her child. Birth-parents, of course, have constitutionally protected rights to raise their children as they see fit, and these rights may only be circumscribed if the government proves that there is a " 'powerful countervailing interest.' " *Barstad v. Frazier*, 118 Wis. 2d 549, 557, 348 N.W.2d 479, 483 (1984) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (termination of parental rights)). This is not a termination-of-parental-rights case; the only issue currently before us is where Caryn should live now, with Mr. and Mrs. D. or with Rebecca G.

██

As a threshold matter, Rebecca G. argues in a passing contention that Mr. and Mrs. D. do not have standing to pursue this appeal. We disagree. Section 48.64(4)(c), STATS., expressly recognizes the right of foster parents to participate and present evidence in hearings that involve "the placement and care" of a child in their household. *See generally Bingenheimer v. Wisconsin Dep't of Health and Soc. Servs.*, 129 Wis. 2d 100, 383 N.W.2d 898 (1986). Any person aggrieved

---

[2] Caryn's guardian *ad litem* filed a brief urging that we affirm the trial court. The State filed a brief urging that we reverse.

[3] Mr. and Mrs. D. also filed two petitions for guardianship for Caryn and a petition to terminate Rebecca G.'s parental rights to Caryn. The trial court did not act on these petitions; it should do so on remand.

from a trial-court order or judgment may appeal. *Koller v. Liberty Mut. Ins. Co.*, 190 Wis. 2d 263, 266, 526 N.W.2d 799, 800 (Ct. App. 1994). This necessarily includes foster parents who are entitled to participate in hearings held under § 48.64(4)(c). *See, e.g., Sallie T. v. Milwaukee County DHHS*, 219 Wis. 2d 296, 581 N.W.2d 182 (1998) (appeal by foster parent; right to appeal apparently not questioned). We now address the merits of Mr. and Mrs. D.'s appeal.

■

The standards to be applied in a custody/placement situation (as opposed to a termination-of-parental-rights case) are set out in *Barstad* and in the more recent *Sallie T. Barstad* recognized the constitutional limitations on governmental intervention:

> On the one hand "[t]he fundamental liberty interest of *natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their children to the State.*" On the other hand, it is evident that the assertion of parental rights is to some extent dependent on the assumption of parental responsibilities, and that the zone of constitutionally protected family autonomy is not defined solely by genetic ties. A biological parent who has never borne any significant responsibility for the child and who has not functioned as a member of the child's family unit is not entitled to the full constitutional protections.

*Barstad*, 118 Wis. 2d at 562–563, 348 N.W.2d at 486 (brackets in *Barstad*, internal citations and introduction to one citation omitted). *Barstad* further explained:

We conclude that the rule to be followed in custody disputes between parents and third parties is that a parent is entitled to custody of his or her children unless the parent is either unfit or unable to care for the children or there are compelling reasons for awarding custody to a third party. Compelling reasons include abandonment, persistent neglect of parental responsibilities, extended disruption of parental custody, or other similar extraordinary circumstances that would drastically affect the welfare of the child. If the court finds such compelling reasons, it may award custody to a third party if the best interests of the children would be promoted thereby.

*Id.*, 118 Wis. 2d at 568–569, 348 N.W.2d at 489.[4] The birth-parent need not, however, be found to be "unfit" at the time of the proceeding in order for the best-

---

[4] *Barstad* is clear that: "A biological parent who has never borne any significant responsibility for the child and who has not functioned as a member of the child's family unit is not entitled to the full constitutional protections." *Barstad v. Frazier*, 118 Wis. 2d 549, 563, 348 N.W.2d 479, 486 (1984). Thus, we harmonize *Barstad*'s comment that "[i]f the court finds such compelling reasons, it may award custody to a third party if the best interests of the children would be promoted thereby," *id.*, 118 Wis. 2d at 568–569, 348 N.W.2d at 489, with its earlier statement, relied on by Rebecca G., that "the 'best interests of the child' is not the proper standard in custody disputes between a natural parent and a third party," *id.*, 118 Wis. 2d at 554–555, 348 N.W.2d at 482, to mean that unless the birth-parent has either done something, or failed to do something, to trigger erosion of the constitutional wall that prevents the State from intruding on the birth-parent's constitutionally protected rights, the fact that the child might be better off somewhere else is an insufficient reason to breach that wall. *See id.*, 118 Wis. 2d at 567–568, 348 N.W.2d at 488–489 ("Absent compelling reasons[,] narrowly defined, it is not within the power of the court

interests standard to kick in; all that is required is that the birth-parent has abdicated his or her responsibilities to care for the child. *See id.*, 118 Wis. 2d at 567, 348 N.W.2d at 488 (" 'As a general matter, but not invariably, the child's best interest will be served by living in a parent's home. However, if circumstances compel a contrary conclusion, the interests of the child, not a supposed right *of even a fit parent* to have custody, should control.' ") (emphasis added) (quoting *LaChapell v. Mawhinney*, 66 Wis. 2d 679, 683, 225 N.W.2d 501, 503 (1975)); *Barstad,* 118 Wis. 2d at 569 n.9, 348 N.W.2d at 489 n.9 ("A complete failure to assume any significant responsibility for the child . . . may well constitute [a] compelling reason[ ] warranting an award of custody to a non-parent."); *Howard M. v. Jean R.*, 196 Wis. 2d 16, 24, 539 N.W.2d 104, 107 (Ct. App. 1995) ("failure to exercise parental responsibilities may result in the forfeiture of constitutional rights to custody"). Stated another way, once there is that abdication, because the birth-parent either has abandoned the child, or has otherwise acted in a way that is inconsistent with core parental responsibilities, necessitating governmental intervention so that the child is no longer under the birth-parent's control, there is no constitutional hurdle to determining the child's future by what is in his or her best interests.[5]

---

to displace a fit and able parent simply because in the court's view someone else could do a 'better job' of 'parenting.' ").

[5] *See, e.g.*, § 48.13, STATS. (listing the criteria justifying governmental intervention on behalf of a child alleged to be in need of protection or services); § 48.415, STATS. (listing the grounds for involuntary termination of parental rights). Significantly, "abandonment" is both a basis to find that a child is in need of protection or services, *see* § 48.13(2), STATS. (referring to a child "[w]ho has been abandoned"), and also a ground to terminate a

*See* § 48.64(4)(c), STATS. ("The court shall determine the case so as to promote the best interests of the child.") (child already in foster-care placement); *Sallie T.*, 219 Wis. 2d at 299, 309–311, 581 N.W.2d at 183, 187–188 (mere compliance with conditions set for return of child to birth-parent is not conclusive). This is just such a case.

There is no doubt but that for much of Caryn's life, Rebecca G. has, to use the language of *Barstad*, "never borne any significant responsibility for the child and . . . has not functioned as a member of the child's family unit." *See Barstad*, 118 Wis. 2d at 563, 348 N.W.2d at 486. Rebecca G. gave birth to Caryn on December 30, 1994. Rebecca G. was not married to the person whom she claims is the father, Steven A. Two children born to Rebecca G. before Caryn's birth, each fathered by a different man, neither of whom was Steven A., were given up by Rebecca G. for adoption. Another of Rebecca G.'s children, born in 1995 and fathered by a fourth man, was also given up by her for adoption. Several months before Caryn was born, Rebecca G. asked an acquaintance, the daughter-in-law of Richard

---

person's parental rights to the abandoned child under § 48.415(1), STATS., *see, e.g.,* § 48.415(1)(a)1r., STATS. (Abandonment is established by proving "[t]hat a court of competent jurisdiction has found . . . that the child was abandoned when the child was under one year of age.") and § 48.415(1)(a)3., STATS. (Abandonment is established by proving "[t]he child has been left by the parent with any person, the parent knows or could discover the whereabouts of the child and the parent has failed to visit or communicate with the child for a period of 6 months or longer.").

D., whether she would like to have the as-of-yet unborn child.[6]

---

[6] The trial court sustained an objection to this evidence as being "real prejudicial" and remote. A trial court's decision to admit or exclude evidence is a discretionary determination, which will not be upset on appeal if it has "a reasonable basis" and was made " 'in accordance with accepted legal standards and in accordance with the facts of record.' " *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498, 501 (1983) (citation omitted). Balancing the criteria set out in RULE 904.03, STATS. ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."), is an especially discretion-sensitive ruling, given the amorphous nature of the considerations. Yet, the central issue in this case is the best interests of Caryn, and her mother's pre-birth desire to either keep her or, as she did with three of her other children, give her up, is highly probative of Rebecca G.'s desires and intents—all of which are significant in assessing not only her desire to bond with Caryn but also her ability to do so. *See* RULE 904.01, STATS. (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Given the trial court's erroneous focus on whether Caryn would be "safe" living with Rebecca G., rather than, as explained, the broader inquiry as to whether Caryn's removal from Mr. and Mrs. D.'s home would be in Caryn's best interests, we conclude, even though Mr. and Mrs. D. have not specifically argued it on appeal, and we are not reversing because of the evidentiary ruling, that the trial court erroneously exercised its discretion in deciding, in essence, that the probative value of this evidence was, in the words of RULE 904.03, "substantially outweighed by the danger of unfair prejudice." *See State ex rel. Jackson v. Coffey*, 18 Wis. 2d 529, 533, 118 N.W.2d 939, 942

From the end of January, 1995, until the middle of March, 1995, Steven A. and Caryn lived with Mr. D.'s daughter-in-law, after which they lived with the daughter-in-law's cousin. On April 23, 1995, Steven A. gave Caryn to Mr. and Mrs. D. In February of 1996, Rebecca G. told the Milwaukee County Department of Human Services that she wanted to let Caryn be adopted by Mr. and Mrs. D., whom she said would make good parents.

During the more than two years between either January 10 or 11, 1995, when Caryn was less than two weeks old, and April 28, 1997, Rebecca G. saw Caryn only twice. The first time was in Mr. and Mrs. D.'s home in February of 1995. The second time was a supervised visit in July of 1996. Other than that, Rebecca G. never sought to see Caryn until January of 1997, when Rebecca G. told Milwaukee County that she wanted Caryn back. From April of 1997 through October of 1997, Rebecca G. had thirteen one-hour supervised visits with Caryn. Rebecca G. had one three-hour unsupervised visit with Caryn in each of the months of November and December, 1997, and January, 1998. Rebecca G. also spent a weekend with Caryn in January, 1998, and two weekends with her in both February and March, 1998. From the end of March, 1998, until the December court trial, Rebecca G. spent twelve separate weeks with Caryn.

In its oral decision awarding placement to Rebecca G., the trial court declined to apply a pure best-interests-of-the-child standard, even though the constitutional barrier to governmental interference with Rebecca G.'s parental rights had been breached by Rebecca G.'s early and lengthy abdication of her paren-

---

(1963) (issues likely to recur on remand may be addressed even though other issues are dispositive of appeal).

tal responsibilities. This is how the trial court phrased its analysis: "I view this as a balancing of the best interest of the child as dictated in a Sub C hearing [under § 48.64(4)(c), STATS.] versus the constitutional and fundamental liberty interests of natural parents to raise their children." Distilling from the case law what the trial court saw as its need to restrict its "inquiry as to [the] best interest of the child" to the circumstances "that arise from the dispositional order in place until the period of time for the return of the child," the trial court put on the back burner of materiality "all the testimony as to what has been presented in the mother's life and what's happened over the years" because, in its view, that is "really not what I believe the Supreme Court wants us to use as the best interest." The trial court thus determined that it "should make our primary emphasis and our primary concern on what's happened during the most recent dispositional order." With that narrow focus, the trial court explained its ultimate rationale:

> I believe psychological parenting [between Mr. and Mrs. D. and Caryn] is a relevant inquiry. I believe, quite frankly, the passage of time is also a relevant inquiry into what is the best interest. But ultimately I believe the primary emphasis that the Court should consider is safety. Is it safe for this child to go back with her biological mother?
>
> I am satisfied by the testimony that the mother has met all conditions for the return of her child. . . .
>
> I am not saying that I am insightful but there are lots of things that need to be done yet. Yes, it is going to be terrible for the return of the child home to the home of her mother.[7] Yes, it is going to be

---

[7] Although the guardian *ad litem* recommended that Caryn be taken from Mr. and Mrs. D.'s home and given to Rebecca G.,

difficult. Yes, there are lots of risks. Everything that [Mr. and Mrs. D.'s lawyer] has said is true, but I am satisfied by clear and convincing evidence that there is no overwhelming safety issue that would preclude the return of the child home.[8]

(Footnotes added.) The trial court's written order, which was signed one month after it put its oral deci-

---

he candidly told the trial court: "I think we can all agree from the psychological testing that the return to the parent will be stressful, if not traumatic to Caryn. Therapy will be required. It is going to be a horrible period of time."

[8] Mr. and Mrs. D.'s lawyer predicted that the transition for Caryn from Mr. and Mrs. D. to Rebecca G. would be rough, as did the guardian *ad litem, see supra* note 7. Thus, he told the trial court "Caryn has been happy for the first four years of her life except, as has been testified to, the times that she has visited with her biological parent." Additionally, he told the trial court that Caryn wanted to stay with Mr. and Mrs. D.; that Caryn had bonded with Mrs. D. and the other children in the D. household; that Rebecca G.'s "attachment capability, her instability, her submissiveness, and her anorexia . . . all add up to risks for Caryn that need not be assumed"; and that, according to a psychologist who urged that Caryn be given to Rebecca G., Caryn " 'is quite likely to do well' " in Mr. and Mrs. D.'s home. He also told the trial court:

> I have heard testimony indicating benefit to Rebecca [G.] if placement of Caryn were made with her. If you're doing a risk/benefit analysis, I don't see the benefit to the child. There is certain — certain separation damage that this child is going to incur. It is going to be long-lasting.
>
> . . . .
>
> The risks are great. Prolong Caryn's happiness. Let Caryn flourish as she has up to this point. Avoid any damage to her by not sending her to Rebecca [G.].

As noted, the trial court decided to give Caryn to Rebecca G. even though it accepted that "[e]verything that [Mr. and Mrs. D.'s lawyer] has said is true."

669

sion on the record, repeated the crux of that oral decision:

> After hearing the testimony of the witnesses, reviewing the exhibits which have been received into evidence and hearing the arguments of counsel, the Court finds that while psychological parenting and the passage of time are relevant inquiries into the best interests of the child, the primary inquiry is the safety of the child. The Court further finds that there is no overwhelming safety issue which would preclude the return of the child, Caryn [A.-G.] to the home of her mother, Rebecca [G.].

We set down at length the trial court's oral decision and written order because our standard of review is severely circumscribed. Whether to keep Caryn with Mr. and Mrs. D. or whether to give Caryn to Rebecca G. is a matter wholly within the trial court's discretion; if the trial court applies the correct legal criteria, its decision is virtually invulnerable. *See Sallie T.*, 219 Wis. 2d at 305, 581 N.W.2d at 186. In our view, the trial court did not apply the correct legal standards to the facts of this case.

First, the trial court placed undue emphasis on Rebecca G.'s relationship with Caryn "during the most recent dispositional order." Second, the trial court supplanted the legislatively mandated focus on Caryn's "best interests" with considerations of mere "safety." We analyze these matters in turn.

### 1. *Relevant time period.*

The trial court based its determination to "make our primary emphasis and our primary concern on what's happened during the most recent dispositional order" on its reading of *Sallie T.*, 219 Wis. 2d 296, 581

N.W.2d 182. We do not agree that *Sallie T.* requires that the trial court be blind of events antedating the "most recent dispositional order." Although *Sallie T.* acknowledged "that in most cases in which a biological parent has successfully met the conditions of return the child can and should be returned to the parent," pointing out that unless parental rights are terminated, birth parents "continue to maintain a constitutional right in the care and custody of their child," which "cannot needlessly be impugned once the parent has complied with the demands made and strictures imposed by the reviewing court," 219 Wis. 2d at 311, 581 N.W.2d at 188, it nevertheless recognized that "[b]ecause additional issues not covered by the conditions of the dispositional order may have arisen in the home environment between the time of the order and the request for change of placement, blind reliance upon those conditions is insufficient to truly act in the best interests of the child," *id.*, 219 Wis. 2d at 310, 581 N.W.2d at 188. Thus, the trial court "can also not close its eyes to detrimental conditions impacting the welfare of the child which have arisen since the imposition of the controlling dispositional order and the conditions of return therein." *Id.*, 219 Wis. 2d at 311, 581 N.W.2d at 188.[9] The trial court focussed on these statements, and interpreted them as limiting its main inquiry.

[9] The sentence as it is quoted in Callaghan's Wisconsin Reports reads: "However, the circuit court can also not close its eyes to detrimental conditions impacting the welfare of the child which have arisen since the imposition of the controlling dispositional order and the conditions of return therein." *Sallie T. v. Milwaukee County DHSS*, 219 Wis. 2d 296, 311 (1998). In West's Wisconsin Reporter, the sentence has been changed by substituting the word "affecting" for "impacting," and, accordingly, it reads as follows: "However, the circuit court can also

In light of the analysis in *Barstad*, which *Sallie T.* neither disavowed nor overruled, we do not read the excerpts from *Sallie T.* relied on by the trial court as narrowly as did the trial court. Rather, we see these excerpts as explaining why a birth-parent's compliance with the terms of a dispositional order might not properly reflect what is in the child's best interests. Certainly, as *Barstad* noted, a long history of neglect or abandonment, coupled with a strong bonding by a child with its caretakers, would permit the courts, consistent with the United States and Wisconsin constitutions, to preserve the *status quo* and leave the child in a happy, nurturing home of a caring and loving non-parent, irrespective of whether the birth-parent was in compliance with the terms of a court order. *See Barstad*, 118 Wis. 2d at 568–569, 569 n.9, 348 N.W.2d at 489 & n.9. As Mr. and Mrs. D. ask in their brief on this appeal, would the birth-parent's murder of other children not be material to a hearing held under § 48.64(4)(c), STATS., "just because it did not occur since the last dispositional order?" Stated another way, a pre-hearing conversion by a neglectful birth-parent who has abandoned a child cannot trump the best interests of that child; children are not chattel. Indeed, even in the termination-of-parental-rights context, where the test is the most stringent, *see Barstad*, 118 Wis. 2d at 560–561, 348 N.W.2d at 485, the legislature has specifically recognized that a birth-parent's abandonment or neglect permits the State to sever the birth-parent's ties to his or her child despite the birth-parent's subse-

not close its eyes to detrimental conditions affecting the welfare of the child which have arisen since the imposition of the controlling dispositional order and the conditions of return therein." *Sallie T. v. Milwaukee County DHSS*, 581 N.W.2d 182, 188 (1998).

quent attempts to make amends by complying with all court-imposed conditions. Under § 48.424(4), STATS. (parent deemed "unfit" if grounds for termination of parental rights exist), the constitutionality of which was upheld by *B.L.J. v. Polk County Department of Social Services*, 163 Wis. 2d 90, 109–110, 470 N.W.2d 914, 922–923 (1991), and contrary to *Mrs. R. v. Mr. and Mrs. B.*, 102 Wis. 2d 118, 132–136, 306 N.W.2d 46, 53–55 (1981), a separate finding that a parent is actually unfit at the time of the termination-of-parental-rights proceeding is no longer a prerequisite to the termination of that parent's rights. *See State v. Allen M.*, 214 Wis. 2d 302, 324–327, 571 N.W.2d 872, 880–881 (Ct. App. 1997) (Fine, J., concurring) (analyzing legislature's enactment of § 48.424(4) to overturn *Mrs. R.*).

## 2. *Best interests versus safety.*

Under § 48.64(4)(c), STATS., the overarching standard is the child's "best interests." The statute's mandate is clear: "The court shall determine the case so as to promote the best interests of the child." This is also the central focus of the Children's Code as a whole. *See* § 48.01(1), STATS. ("In construing this chapter, the best interests of the child or unborn child shall always be of paramount consideration."); *see also* § 48.01(1)(ag), STATS. ("It is further recognized that, under certain circumstances, in order to ensure that the needs of a child, as described in this paragraph, are provided for, the court may determine that it is in the best interests of the child for the child to be removed from his or her parents, consistent with any applicable law relating to the rights of parents."). Contrary to the trial court's view, "safety" is thus *not* the "primary emphasis that the Court should consider"—"safety"

673

and "best interests" are *not* synonyms. A child can be "safe" in an environment even though it is not in the child's best interests to be in that environment. Moreover, by twice characterizing Rebecca G.'s home as not presenting an "*overwhelming* safety threat" (emphasis added), the trial court gives us a negative pregnant akin to what Alexander Pope characterized in his *Epistle to Dr. Arbuthnot* as to "damn with faint praise."

Constitutional protections of a parent's rights to his or her child do not prevent application of the statute making Caryn's best interests the central focus in determining where she should live. As we have already discussed, at this stage of the government's involvement with Caryn and Rebecca G., the best-interests-of-the-child is also the constitutional standard. *See Barstad*, 118 Wis. 2d at 568–569, 348 N.W.2d at 489 ("If the court finds such compelling reasons ["abandonment, persistent neglect of parental responsibilities, extended disruption of parental custody, or other similar extraordinary circumstances that would drastically affect the welfare of the child"], it may award custody to a third party if the best interests of the children would be promoted thereby."); *Sallie T.*, 219 Wis. 2d at 311, 581 N.W.2d at 188 ("[T]he best interests of the child standard is to be defined in relation to the child and not to be used as a euphemism for the biological parent's compliance with the return home conditions of a dispositional order. Compliance with the condition of a CHIPS [child in need of protection or services] dispositional order does not create a presumption that it is in the child's best interests to be returned to the biological parents.").

■

We remand this case to the trial court for a new evidentiary hearing and its determination of whether,

consistent with §§ 48.01(1), 48.01(1)(ag), & 48.64(4)(c), STATS., it would be in Caryn's best interests to continue to live with Mr. and Mrs. D., or whether it is in her best interests to live with Rebecca G. Among the factors the trial court may consider, if they are applicable, are those set out by the legislature where it has attempted to define what may indicate the "best interests" of a child who is the subject of court intervention. *See* §§ 48.426(3) & 767.24(5), STATS. *See F.R. v. T.B.*, 225 Wis. 2d 628, 639, 593 N.W.2d 840, 845 (Ct. App. 1999) ("When lawmakers knowingly use the same phrase or terminology in two different statutes addressing similar topics, we presume that the legislature intended them to have the same meaning in both statutes."). All evidence relevant to the trial court's best-interests analysis should be admitted and given whatever weight the trial court reasonably deems appropriate. *See* § 48.64(4)(c); *see also supra* note 6.

*By the Court.*—Order reversed and cause remanded.