REILLY, P.J.[1]
¶1 J.P.S., M.R.S.'s paternal grandmother,[2] appeals from an order granting a petition for a change of placement of M.R.S. from grandma's home to the home of foster parents, A.C. and R.C.,[3] pursuant to WIS. STAT. § 48.357. For the reasons that follow, we agree that the circuit court properly exercised its discretion and accordingly affirm.
¶2 M.R.S. was born in December 2014 while both her birth mother and father[4] were incarcerated. Four days later, an order for temporary physical custody was entered, placing M.R.S. in the home of the foster parents. Walworth County Department of Health and Human Services (DHHS) subsequently filed a Child in Need or Protection or Services (CHIPS) petition, and a CHIPS dispositional order was entered in June 2015, ordering continued placement of M.R.S. in the foster parents' home.
¶3 In June 2017, DHHS petitioned for a postdisposition change of placement for M.R.S. based on an investigation by Jefferson County Human Services.[5] The order changing M.R.S.'s placement from the foster parents to a second foster home was granted in July 2017 without a hearing.[6] Then, in September 2017, DHHS filed a second petition seeking an order granting a change in placement from the second foster home to grandma's home. No objection was made to the change of placement, and the circuit court again granted DHHS's request without a hearing.
¶4 In November 2017, DHHS placed M.R.S. in respite care with the foster parents after allegations arose questioning the safety of M.R.S. in grandma's care. DHHS ultimately filed an emergency change of placement pursuant to WIS. STAT. § 48.357,[7] placing M.R.S. back into the foster parents' home. The notice filed by DHHS alleged that grandma "has demonstrated a pattern of being unable to perform the duties of a caregiver and is not able to manage stress related to having placement of [M.R.S.]"
¶5 According to DHHS, M.R.S. was in day care for forty hours a week and had "been spending most, if not all, weekends with [the foster parents]" while in the care of grandma. DHHS identified several concerns, including that grandma "administered [M.R.S.] cough syrup that was not for her age and not prescribed to her," allowed M.R.S. to pick up a box cutter, failed on multiple occasions to buckle M.R.S. into her car seat properly, sent M.R.S. to the foster parents on the weekends without telling DHHS, and generally "couldn't handle M.R.S." DHHS also explained that grandma had failed to be a "present and active caregiver when [M.R.S.] is in distress" as grandma "often responds by having others take M.R.S. and watches from afar, or goes into another room.... [Grandma's] decisions to have strangers and other assist [M.R.S.], sometimes forcibly removing her, adds to the psychological distress [M.R.S.] is experiencing. [Grandma's] abdication of her role in assisting [M.R.S.] has been observed many times by professionals and service providers." The notice also detailed that M.R.S. "is very bonded to the [foster] family who had placement of her for the first two and a half years of her life. [M.R.S.] sees them as her family."
¶6 Grandma and M.R.S.'s birth father objected to the emergency change of placement and demanded a hearing.[8] The circuit court scheduled a hearing, and over the course of five days, during December 2017 and January 2018,[9] heard testimony from multiple witnesses and interested parties. The circuit court granted the emergency change in placement and outlined in detail on the record the basis for its decision to grant the petition removing M.R.S. from the custody of grandma and placing her back in the foster parents' home. Grandma appeals.
¶7 The resolution of this case rests entirely on whether we conclude that the circuit court properly exercised its discretion when it granted DHHS' petition for an emergency change of placement. Whether to change placement is a decision wholly within the circuit court's discretion, and "if the [circuit] court applie[d] the correct legal criteria, its decision is virtually invulnerable." Richard D. v. Rebecca G. , 228 Wis. 2d 658, 670, 599 N.W.2d 90 (Ct. App. 1999). As the court in Richard D. explained, under WIS. STAT. § 48.64(4)(c), addressing placement of children in out-of-home care,[10] "the overarching standard is the child's 'best interests.'... This is also the central focus of the Children's Code as a whole." Richard D. , 228 Wis. 2d at 673 ; see also WIS. STAT. § 48.01(1) ("In construing this chapter, the best interests of the child or unborn child shall always be of paramount consideration."). We will uphold the circuit court's exercise of discretion unless we find "either that the circuit court has not exercised its discretion or that it has exercised discretion on the basis of an error of law or irrelevant or impermissible factors." Barstad v. Frazier , 118 Wis. 2d 549, 554, 348 N.W.2d 479 (1984).
¶8 The legal arguments grandma presents to this court are difficult to decipher from her pro se brief-in-chief. The bulk of her brief merely restates her testimony and arguments before the circuit court and attempts to explain her side of the story again before this court. Grandma appears to take issue with the circuit court's exercise of discretion for largely accepting the testimony of the foster parents, the social worker, and the DHHS supervisor as to the concerns that prompted M.R.S.'s change in placement. Grandma further faults DHHS for its handling of the case, from its failure to promptly establish her son's paternity of M.R.S. to its failure to grant her a foster care license, and she challenges the foster parents' motives, who she claims "took all of [her] good intentions, and came around from behind with nothing less than Chariots of Fire." Grandma presents no properly supported argument as to an erroneous exercise of discretion committed by the circuit court as a result of an error of law or consideration of impermissible factors.
¶9 We conclude that the circuit court properly exercised its discretion in this case. We reiterate, as did the circuit court, that this appeal addresses only the change of placement from grandma's home to the foster parents' home and does not impact the long-term future placement of M.R.S. As such, our review need not address the long-term best interests of M.R.S.'s placement with the foster parents. That being said, it is difficult not to observe based on the record that the only true constant in M.R.S.'s life has been her foster parents. In the circuit court's view, M.R.S. should never have been removed from the foster parents' care in May 2017: "I will admit to all of you ... that I made a mistake. I shouldn't have [signed the order]. That's on me." M.R.S. had been living as a family with them and their biological daughters from days after birth until she was two and one half years old (M.R.S. was removed May 25, 2017) and then again for substantial periods of time when M.R.S. was in the care of other foster parents and grandma's care from early July 2017 until November 2017 when M.R.S. was again placed in their care full time. The foster parents are the only parents she has ever known, and she calls them mommy and daddy and their children her sissies, or sisters.
¶10 The circuit court's ruling specifically addressed the cough syrup grandma gave to M.R.S., agreeing that there was "no evidence of any harm done to [M.R.S.]," but expressing concern that grandma did not consult with a medical care professional. The court explained that trusting a picture of a child on the box of medication, or asking the stock clerk at the pharmacy, or relying on the advice of a day care provider is not "the way to make decisions about medical care for a young child." The issue in the court's mind was not whether harm came to M.R.S. but about the "decision-making process itself that occurred [by grandma] to get that as the decision."
¶11 The court also expressed its concern with grandma giving M.R.S. to the foster parents with such frequency during the period that M.R.S. was supposed to be in grandma's care. The court's concern was not M.R.S.'s safety with the foster parents, but what grandma's behavior demonstrated. It questioned whether the "sheer frequency of it, duration of it, and amount of it" had morphed an "altruistic, completely appropriate thing for [grandma] to do" into a very real issue of whether grandma is able to handle M.R.S. on a full-time basis.
¶12 The court also addressed testimony that grandma went to the foster parents' home on Christmas when she knew them to not be home; parked her car down the street instead of in the driveway; did not ring the doorbell, but walked around the house looking in the windows; and then returned to her car to get her camera and take pictures of the foster parents' garage and garbage cans.[11] In the court's mind this was the behavior of "someone on a stakeout" who is "trying to gather dirt ... as part of a contested legal proceeding" and it was "concerning" to the court.
¶13 In summary, the circuit court found that
Based on the totality of the circumstances, my review of the facts in this case and my judging of the credibility of all of the parties as they were testifying in court over the course of the past several days, I simply find that those concerns that I have are enough to grant the department's request to change placement in this case from [grandma] to [the foster parents] on a formal basis; and I find that there's enough in those concerns that rise to the level of an emergency when ... taken in their totality, especially as it relates to the specific concerns that I've outlined on the record here today.
¶14 In addition to the issues specifically addressed by the court, our review of the record indicates an ongoing concern with grandma failing to properly secure M.R.S. in her car seat and a suggestion in the record that this concerning behavior continued after the foster parents and the social worker spoke with grandma about the importance of completely buckling M.R.S. and after grandma was provided a new car seat when she indicated that M.R.S. was getting too big for the old one. Also not specifically addressed by the circuit court, but a fact that the court alluded to, is DHHS' concern about grandma's truthfulness to DHHS, emotional stability, and ability to handle the stress of caring for M.R.S. on a full-time basis. Both the social worker and the DHHS supervisor testified at length about these issues.
¶15 We share the circuit court's assessment that this is "a very difficult situation," and we appreciate the court's acknowledgement that mistakes were made and the situation escalated due to decisions by all involved, including the court itself. The court discussed in detail its distress with how changes in placement were handled during this case. The result of those decisions was that the future health and wellness of a very young child may have been irrevocably impacted. The court attempted to rectify this error by allowing a full and complete investigation of the allegations by conducting a hearing on the matter over the course of five days and taking hours of testimony from the parties. It is clear that the court did not give short shrift to the matter in this case and that its act of discretion was properly supported by the record.
¶16 We affirm the circuit court's decision granting the petition for change of placement from grandma to the foster parents.
By the Court. -Order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)4.

This appeal is decided by one judge pursuant to Wis. Stat. § 752.31(2)(e) (2015-16). All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

For ease of reading, we will refer to J.P.S. as "grandma."

We will refer to A.C. and R.C. as "the foster parents."

M.R.S's birth father's paternity was not established until July 2015.

Neither the results of the investigation nor the specific allegations were included in the record on appeal, but the parties testified that the allegations related to alcohol consumption by the foster parents and were ultimately found to be unsubstantiated. The foster parents never lost their foster license, but were subject to a corrective action plan that they were working on at the time of the hearing.

The foster mother testified that they had hired a lawyer to contest the change of placement, but they were told by grandma that "someone within [DHHS] had told her that if we didn't want [DHHS] coming back and causing trouble ... with our biological girls, we should not object to the change of placement.... We didn't want any more trouble with [DHHS], so we dropped the objection."

As applicable, Wis. Stat. § 48.357(2)(a) provides:
[I]f emergency conditions necessitate an immediate change in the placement of a child or expectant mother, the person or agency primarily responsible for implementing the dispositional order may remove the child or expectant mother to a new placement, whether or not authorized by the existing dispositional order, without [prior notice or consent]. Notice of the emergency change in placement shall be sent to [the child, the child's counsel or guardian ad litem, the parent, guardian, and legal custodian of the child, any foster parent or other physical custodian ... and the child's court-appointed special advocate] within 48 hours after the emergency change in placement. Any party receiving notice may demand a hearing under [§ 48.357(1)(am)2. ].

Wisconsin Stat. § 48.357(1)(am)2. provides in pertinent part:
[A]ny person receiving the notice under subd. 1. or notice of a specific placement under [ Wis. Stat. §] 48.355 (2) (b) 2., other than a court-appointed special advocate, may obtain a hearing on the matter by filing an objection with the court within 10 days after the notice is sent to that person and filed with the court. Except as provided in subds. 2m. and 2r., if an objection is filed within 10 days after that notice is sent and filed with the court, the court shall hold a hearing prior to ordering any change in placement.

The hearing began on December 13, 2017, and was continued to December 22, 2017, and again from January 8-10, 2018.

Although grandma does not address the burden of proof on appeal, DHHS suggests that Wis. Stat. § 48.357 does not specify an applicable standard for the burden of proof within the statute. DHHS notes, however, that Wis. Stat. § 48.64(4)(c), relating to placement of a child in out-of-home care, provides that "[t]he petitioner has the burden of proving by clear and convincing evidence that the decision or order issued by the agency is not in the best interests of the child." DHHS suggests that grandma is the petitioner in this case and carries the burden of proving by clear and convincing evidence that the decision and order of the agency in removing M.R.S. from the home of grandma and placing her back with the foster parents is not in the best interest of M.R.S. We conclude that regardless of who has the burden in this case, the result would be the same; therefore, we will not discuss it further.

The foster father testified that he was sick that day and did not go with the rest of the family out of town, which is why he was at home to observe grandma's behavior and take a picture.