**COURT OF APPEALS
DECISION
DATED AND FILED**

**September 10, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2025AP903-FT**

Cir. Ct. No. 2021JC40

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT II**

IN THE INTEREST OF L.H., A PERSON UNDER THE AGE OF 18:

SHEBOYGAN COUNTY DEPARTMENT OF HEALTH & HUMAN SERVICES,

PETITIONER-RESPONDENT,

V.

N.H. AND E.H.,

RESPONDENTS,

L.H.,

OTHER PARTY-APPELLANT.

APPEAL from an order of the circuit court for Sheboygan County: SAMANTHA R. BASTIL, Judge. *Affirmed*.

¶1 GROGAN, J.[1] Luke[2] appeals from an order denying his request for change of placement in connection with a CHIPS[3] dispositional order. Luke argues that the circuit court erred when it denied his request to change his placement from an outside placement to that of his father's home, and specifically asserts that the court erroneously exercised its discretion by failing to properly weigh the relevant factors. This court affirms.

## I. BACKGROUND

¶2 A September 2021 CHIPS petition alleged that Luke was a child in need of protection or services under WIS. STAT. § 48.13(2), (10), and (10m). Prior to filing the CHIPS petition, the Sheboygan County Department of Health and Human Services (Sheboygan DHHS) took temporary custody of Luke due to his mother's refusal to allow him to return home, and due to not believing placement with his father was suitable as a result of substantiated sexual abuse of his biological daughter three years prior. The circuit court thereafter entered a CHIPS dispositional order in March 2022 upon determining that Luke was in need of protection or services. The order required Luke's father to participate in counseling, complete a psychosexual evaluation, and to comply with the evaluation treatment provider's recommendations.

¶3 In May 2024, Luke filed a request to change placement to his father's home. At the hearing, which spanned multiple days, Dr. Latoya K.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

[2] Luke is a pseudonym.

[3] "CHIPS" is an acronym for Child in Need of Protection or Services.

Williams testified that she conducted a psychosexual evaluation of Luke's father in April 2023. According to Williams, Luke's father was "guarded" and exhibited "instrumental anger," which she described as occurring when someone undergoing an evaluation "expresse[s] … frustration," elevates his tone of voice, exhibits "slight yelling," or engages in other behaviors "as a tool to back the evaluator up" or "to make the evaluator back off." Williams also testified that Luke's father attempted to minimize or justify his actions regarding his daughter's assault by claiming that "he didn't have the money to measure her for a bra, so he did it himself," and that during this process he assaulted her "without thought."

¶4      As part of the evaluation, Williams subjected Luke's father to two tests, STABLE and STATIC. Williams explained that the STABLE test "assesses personality constructs" and "looks for who the person is." She explained that the test is "a bit more subjective" and that it is "not weighted as heavily as the STATIC because" it assesses "the parts of the person that they can change over time if they wanted to." In contrast, Williams explained, the STATIC test "assesses for risk factors that can't be changed." Williams testified that she has a "preference for combining" a subject's scores on the STABLE and STATIC tests because "the developers of [the tests] said that [evaluators] can" do so. The combination of Luke's father's test scores indicated an eleven percent chance of reoffending, a probability that Williams opined constituted "a moderate risk."

¶5      Williams further opined that Luke's father was deceptive during the evaluation. For example, when asked if he "demonstrated an attraction or a deviance towards males or male children[,]" Williams explained that the father was not "honest on the questionnaires that would assess for that" and that on the sex offender treatment evaluation attitude questionnaire, in which subjects are asked to provide a number between one and four in responding to specific

3

questions, "the average person is going to create a scatter" of responses but that Luke's father "just did all ones down the form." Williams suggested that responding in this way "is a sign that the person is malingering" and testified that upon seeing his responses, she gave him an "opportunity to go ahead and do the questionnaire a second time and to be more honest[.]" In response, she said, Luke's father proceeded to yell at her and denied being dishonest.

¶6 Williams also testified that Luke's father has a history of unmanaged depression and that this is relevant to his risk of reoffending because "people are at their highest risk to sexually reoffend when they are going through a stressor." She explained that "even if [an individual's] risk is as low as two percent, what happens with that person is when they go through a stressor, their risk elevates." Williams provided various examples of real-world stressors such as experiencing a depressive episode, going into debt, and job loss. According to Williams, while Luke's father's evaluation indicated an eleven percent chance of reoffending, "that risk could shoot up very high and it could shoot up at 80, 90, close to a hundred percent dependent on how difficult of a time he's having."

¶7 Williams further confirmed that Luke's father "has experienced deviant incestuous arousal" and explained that "not every sex offender has the ability to be aroused to their own children" and that Luke's father does have "the ability to be aroused by his own child." When asked, she also confirmed that this arousal is not "something that can suddenly stop without treatment," and explained that "[t]he arousal pattern doesn't stop once it's activated" but rather is "an ongoing thing" and that the goal of treatment is to "teach [offenders] how to extinguish the urge once it's activated."

¶8 Williams also explained that the purpose of sex offender treatment, which she recommended for Luke's father, is "to address the dynami[c] risk factors that can change with treatment." For example, Williams explained that "one of the things [she] suggested he work on was … the lack of empathy and compassion that [she] picked up on from his interview." She noted that "[h]e didn't seem to have very much empathy when talking about other people and other people's stressors" and "came off as pretty callous when talking about things that other people around him had gone through." As a result, she opined that "[h]is problem solving skills appeared to be at issue as well in that he kind of seems to look for the easiest solution to his problems as possible, but then the easiest solution is usually the one that just creates more problems." She also noted issues with his general "attitude and disposition," specifically stating that being questioned elevates his anger, which "creates an additional stressor for himself that can elevate his risk in the moment."

¶9 In describing Luke's father's behavior during the evaluation, Williams said he "wasn't really ready to own the situation that happened with his daughter." She testified that "[h]e was in denial about how the sexual assault happened" and that "how he described it happening is just very different from the research on sexual offending and it's different from how treatment sees offending." Williams explained that the father's "stance that it was just this thoughtless act that happened right there in the moment and there had not been any thoughts about this prior, any fantasizing about it prior … doesn't fit the research and it doesn't fit how the treatment is done." Williams opined that addressing these "minimization[s]" and "justifications" makes it "much easier for [offenders] to work on the additional part of learning to manage their arousals."

¶10 When asked whether Luke's father should participate in or complete sex offender treatment prior to being reunified with his children, Williams explained that due to his lack of openness during the evaluation, she was unable to determine whether he posed a risk to his son. She stated that his failure to participate in sex offender treatment prevented her from having "the information that [she] need[s] to know what things would look like in terms of [risk to] his son." She testified, however, that she had "information that suggests that he's at risk for offending against his daughters."

¶11 Social worker Kami Richter, the case worker assigned to Luke's case, also testified. According to Richter, Sheboygan DHHS considered Williams' recommendation that Luke's father participate in sex offender treatment to be a recommendation of a treatment provider that he was required to comply with as set forth in the CHIPS dispositional order. She explained that she had provided the names of twelve treatment providers to Luke's father in addition to the two Dr. Williams had provided, and that to her knowledge, he had not completed any form of sex offender treatment and was not currently participating in sex offender treatment at the time of her testimony. Richter also testified that she did not believe that he was complying with the dispositional requirement that he participate in individual and family therapy and confirmed that Sheboygan DHHS's "primary concern is [Luke's father's] lack of sex offender treatment" and that it was "opposed to reunifying [Luke] with his father" "until that's completed[.]"

¶12 At a later hearing, the circuit court heard testimony from Luke, who expressed his wish to return home with his father. After hearing this testimony and argument from counsel, the court delivered an oral ruling denying Luke's request for a change in placement, stating:

Dr. Williams' testimony was very clear, and this Court has two primary concerns. And that is exactly what Attorney Blum pointed out which is, one, that she is unable to rule out that [Luke] could be one of [the father's] victims and that is because of his deception in the filling out of his questionnaire and checking one, circling one for everything. And Dr. Williams articulated how she pointed that out to [the father], gave him a second opportunity to fill it out. And he still indicated ones.

And so she is not able to opine as to whether [Luke] can be ruled out as a victim for [his father]. And frankly, sexually assaulting a child once is one time too many. And when there is a history of sexual assault of a biological child and [a] professional who this Court has deemed credible that indicates that she is unable to rule out because of [the father's] deception, … [Luke] being a victim, this Court cannot return [Luke] to your home. And the second reason is … making sure that [Luke] does not grow up to do what [his father] did to one of his children. And without that sex offender treatment, this Court cannot be assured that that will not happen.

Luke appeals.

## II. STANDARD OF REVIEW

¶13 A circuit court may order a change of placement or trial reunification for a child subject to a CHIPS dispositional order where, in its discretion, it determines that doing so is in the child's best interest. *Tina B. v. Richard H.*, 2014 WI App 123, ¶45, 359 Wis. 2d 204, 857 N.W.2d 432; WIS. STAT. § 48.357. To conclude that the circuit court erroneously exercised its discretion, this "court must [conclude] either that [it] has not exercised discretion or that it has exercised discretion on the basis of an error of law or irrelevant or impermissible factors." *Barstad v. Frazier*, 118 Wis. 2d 549, 554, 348 N.W.2d 479 (1984). "[I]f the trial court applie[d] the correct legal criteria, its decision is virtually invulnerable." *Richard D. v. Rebecca G.*, 228 Wis. 2d 658, 670, 599 N.W.2d 90 (Ct. App. 1999).

## III. DISCUSSION

¶14 Luke contends that the "[t]he decision by the [circuit] court gave insufficient weight to the evidence presented by [Luke] throughout the motion hearing." Specifically, he argues that "[m]atters such as [Luke]'s age, level of maturity, and desire to return to his father's care [were] noted by the court but not given their deserved weight." Luke also asserts that "Dr. Williams provided evidence that the likelihood of [Luke's] father re-assaulting a child was low" and that "the likelihood of [him] assaulting a male child is even lower, given that [he] is a heterosexual male who is attracted to females."

¶15 Despite these assertions, Luke nevertheless admits, as he must, that the circuit court *did* expressly consider Luke's testimony, which is clear from the court's statement during its oral ruling that Luke's "wishes do carry a lot of weight[.]" The court further acknowledged that Luke was engaged and punctual throughout the course of the proceedings and that "his wishes" were taken "under serious advisement." The court expressly concluded, however, that Luke's wishes were outweighed by the concern that his father, in failing to pursue sex offender treatment, posed a substantial risk of reoffending and that assessing the specific risk posed to Luke was impossible due to his father's lack of honesty during Williams' evaluation. In concluding that Luke's wishes were outweighed by other evidence presented, the court relied largely on Williams' testimony, which had explained that Luke's father's risk of reoffending was made greater by his unmanaged depression, his continuing denial of his need for sex offender treatment, and his failure to honestly engage with Williams during the evaluation.

¶16 Having reviewed the Record, this court cannot say that the circuit court's analysis was based upon any errors of law or fact or that it was based upon

impermissible factors. While there may have been, as Luke suggests, "evidence that supported" placement with his father, the court did not exceed its discretionary authority in concluding that the evidence that did *not* support placement with his father outweighed the evidence Luke relies upon on appeal. Accordingly, Luke has failed to establish that the court did not properly exercise its discretion, and the order denying his request for a change in placement is therefore affirmed.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.