COURT OF APPEALS
DECISION
DATED AND FILED

December 30, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP2079**

**STATE OF WISCONSIN**

Cir. Ct. No. **2015JC50**

**IN COURT OF APPEALS
DISTRICT II**

---

IN THE INTEREST OF E.A.U., JR., A PERSON UNDER THE AGE OF 18:

WALWORTH COUNTY DEPARTMENT OF HEALTH & HUMAN SERVICES,

PETITIONER-RESPONDENT,

V.

E.U.,

RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Walworth County: DAVID M. REDDY, Judge. *Affirmed.*

¶1 DAVIS, J.[1] "Edward" appeals from circuit court orders denying his request to change placement and denying his alternative request for trial

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version.

reunification with his son, "Adam."[2]  We hold that the circuit court did not erroneously exercise its discretion in this matter and accordingly affirm.

## BACKGROUND

¶2    In June 2015, the Walworth County Department of Health & Human Services (the Department) removed then-six year-old Adam to foster care because of maternal neglect.  *See* WIS. STAT. § 48.13(10).  Edward's whereabouts were then unknown; he had been deported to Mexico in 2013 following a conviction for substantial battery, domestic abuse of Adam's mother.  A November 2015 dispositional order adjudged Adam to be a child in need of protection or services (CHIPS) and continued his placement in foster care.

¶3    It was some months before Edward learned that Adam was in foster care.  Sometime in 2016, Edward reached out to the Department to seek placement of Adam, and in May 2017, the Department filed a request to change placement to Edward's care.  *See* WIS. STAT. § 48.357.  That request was denied, as were additional requests over the next two years—culminating with the orders that are the subject of this appeal.[3]  These last orders followed a hearing at which the parties gave oral argument only and the circuit court based its ruling on evidence from prior hearings.  We therefore summarize the substance of those hearings.

---

[2]  For ease of reading, we refer to the appellant and his minor child by pseudonyms, instead of initials.

[3]  After Adam was removed from his mother's care, she did not progress towards fulfilling the conditions for his return and remained largely absent from his life.  Thus, the Department's permanency goal did not include reunification with the mother.

¶4      In May 2017, the Department submitted a request to change placement to Edward's care; it also submitted a new permanency plan[4] for Adam with the updated goal of reunification with Edward.  At the hearing to review the permanency plan, the circuit court expressed concerns about changing placement, although it admitted its fears might be unfounded.  The court worried about sending Adam to a different country, one where he had never lived, and to an area (Nogales, Mexico) that might be unsafe.  The court also worried that it would have no ability to return Adam to Wisconsin if anything went wrong.  The court put the Department on notice that when it came time for the placement hearing, it would want to see "something more" than a simple home study of Edward.

¶5      In October 2017, the circuit court held an evidentiary hearing on placement; Edward participated by video.  The court heard testimony from Edward and Adam's case manager, and it considered two home studies.  The court denied the Department's request to change placement after finding the custody study "useless" and unreliable, as many of the key facts had changed since it was written in March 2017.  At the time of the study, Edward was living with his girlfriend and her children in his girlfriend's house.  By the time of the hearing, however, Edward was married to a different woman who had not been interviewed as part of the home study; he was still living in his former girlfriend's house (with his new wife), but the house's ownership status was unclear.  According to Edward, his new wife would play a significant caretaker role, so the court found it "most concerning" that the Department had apparently not even been aware that Edward was married.

---

[4] A permanency plan is "a plan designed to ensure that a child is reunified with his or her family whenever appropriate, or that the child quickly attains a placement or home providing long-term stability."  WIS. STAT. § 48.38(1)(b).  These plans are reviewed by the court or an appointed panel every six months and by the court every twelve months.  Sec. 48.38(5), (5m).

Edward had also stated that his family would help care for Adam, but there was no information about his family in the home study.

¶6    The court concluded:

> What I'm left with since I can't rely on the custody study is simply taking [Edward's] word for all of the facts that have been put in the record here today, because there is no independent verification by anyone of the majority of those facts. I can't simply take the word of a convicted felon who I have no evidence has followed court orders in the past[5]… with a custody study that doesn't in any way, shape or form reflect the current circumstances of the home that I would be sending him to ….

¶7    One month later, in November 2017, the Department filed an updated permanency plan. The plan outlined the "concerns" the court had articulated at the October 2017 hearing and stated that it would "assist and monitor [Edward's] effort to address these concerns with a variety of services." It noted that "the Mexican Consulate will be coordinating with Mexican Child Welfare agency (DIF) to acquire another, more thorough home study that will address the court's specific concerns" and that "[a] background check will be completed on [Edward's] wife." At the hearing on the permanency plan, the court determined that the goal of reunification with Edward was appropriate. It set a date for another permanency plan review hearing in six months and stated that it "encourage[d] everyone to work hard for the next six months on these conditions, maybe we can come up with a more clear idea

---

[5] The court had previously noted that there was no evidence of Edward's providing financial or material support for Adam or providing restitution in the felony domestic violence case. This concerned the court because it indicated that Edward might be less likely to "comply with court orders in the future …. [t]he thinking being essentially that if he was not complying with court orders in the family realm or the criminal realm, there would be no reason to have me believe that he would follow orders in the juvenile realm either."

for [Edward] what he needs to do and then we can have hopefully a more final hearing at our next permanency plan hearing."

¶8    The Department filed a new permanency plan in April 2018. The plan stated that the Department had given Edward a list of specific conditions to complete for Adam's return. These included completing domestic violence and alcohol/drug assessments; providing the Department with information about his wife, so a background check could be done on her; regularly including his wife in video calls with Adam; and taking part in a new home study. The permanency plan noted that Edward had "missed/not been available for several phone calls," despite repeatedly stating that the time and day of the calls were convenient. In addition, despite the Department's request, Edward's wife was not sitting in on these video calls. Overall, though, the Department described Edward as "remain[ing] very cooperative with the Department."

¶9    In May 2018, Edward filed a request to change placement. A hearing was held on the request in July. From the testimony of Edward and the Department case worker, the court learned that Edward was working towards, but had not completed, all the conditions for Adam's return. For example, Edward had completed an updated home study and anger management classes, had demonstrated stable employment, and testified about concrete plans for schooling and caring for Adam. On the other hand, Edward had not contacted Adam's therapist, requested report cards, or taken any similar steps to "meet [Adam's] developmental needs"; he had also missed several video call appointments with Adam. Furthermore, it appeared that Adam and Edward's wife had not developed a relationship, mainly because of the language barrier, even though she would be caring for Adam while Edward was at work. Although outside of Edward's control, the Department also

did not apprise the court of any concrete plans for maintaining contact with the Mexican authorities following Adam's placement.

¶10     For these reasons, the court denied placement. The court credited the number of steps Edward had taken. But the court found it "critical that there be communication between the Department … and the equivalent department in Mexico" and found it "incredibly concerning" that there was none to date. Naturally, the court directed this concern to the Department, but it addressed equally important concerns to Edward. The court found it important that Edward be in communication with Adam's therapist. The court also asked Edward to look into arranging therapy in Mexico in anticipation of placement. The court further found it important "as a safety concern" that Adam and Edward's wife both learn basic Spanish and English (respectively), as she would be his day-to-day caretaker. The court stressed that Edward's wife should more fully participate in video chats. Finally, the court addressed several "medium level concerns," asking Edward to complete the drug and alcohol assessment and more closely monitor Adam's progress in school. The court concluded, "I think where that leaves us is that we may be seeing some light at the end of this tunnel, but I think the light may be a little ways off still."

¶11     The Department filed another permanency plan two months later, in September 2018. The plan updated the court on Edward's steps toward reunification, noting areas of progress and for improvement:

> [Edward's] wife has participated by saying "Hola" in one video chat. When asked why she hasn't been participating, [Edward] stated "she is too shy." He completed his [alcohol and other drug abuse] assessment, and has participated in 1 phone call with [Adam's] therapist…. [Edward] has had the last two months to make significant progress with his relationship with [Adam] as well as a chance to demonstrate his understanding and investment to ensuring [Adam's]

emotional needs are being met in a therapeutic setting, yet he has only participated in one phone call. [Edward] continues to make efforts towards reunification, but has still not completed his conditions of return. [Edward's] motivation seems sporadic at times…. [Edward] remains very cooperative with the Department and timely in his communication….

¶12    At the October 2018 hearing on the permanency plan, the Department discussed Edward's progress. The Department explained that there was initially "a lot of miscommunication between [Edward] and the therapist," but that there was now a family session scheduled for Adam and Edward that was "very crucial" for Edward to attend. The Department noted two areas of continued concern. First, "although it's been very clear to [Edward] that his wife is expected to get to know [Adam] as she will be [Adam's] primary caregiver … there really hasn't been any movement on … her trying to learn English." Second, "[t]he phone calls between [Adam] and his dad have been regular but not always consistent" even though they were "regularly scheduled," causing "a lot of stress on [Adam]." The Department stated that Edward's home and job were stable and his background checks completed—"[i]t's more of these finer details, and we want to give him an opportunity to meet those finer details."

¶13    The Department's next permanency plan, filed in March 2019, noted that these two concerns were still unresolved: "[Edward] has not been participating in [Adam's] therapy nor has his wife been participating in video chats. [Edward] has missed several video chats in the last few months, due to getting his days mixed up, not having internet access, or simply not being available at the time of a call."

¶14    In April 2019, Edward filed the requests at issue in this appeal: (1) to change placement, beginning in June 2019; or (2) in the alternative, for trial

reunification during Adam's 2019 summer vacation. *See* WIS. STAT. §§ 48.357, 48.358. This time, the Department objected, for the following reasons:

1. [Edward] … often works 7 days a week and usually long hours each day [and] has stated that his wife will be the primary caretaker for [Adam]. [Adam] does not know [Edward's] wife and she does not speak English. [The two] will not be able to communicate … in the event of an emergency.

2. [Edward] has … lack[ed] … follow through on learning about [Adam's] mental health, engaging in any family [therapy] sessions, or learning about his schooling or medical care.

3. [Edward] … consistently misses one or two video visits per month. When video visits do occur, they are short and superficial. [Edward] does not write [Adam] on a regular basis. Furthermore, [Edward's] wife has only said "hola" on one video visit to [Adam] last August. [Edward's] wife has shown no interest in participating in the visits and getting to know [Adam] ….

4. The Department is not aware of any legal mechanism that will ensure the Department's ability to retrieve [Adam] from Mexico if any issues related to safety or conditions of return [arise] ….

5. [Adam] has voiced to his foster parents and social worker that he does not want to live in Mexico ….

6. [Adam] attends individual therapy[,] … and continuing therapy would be in his best interest[,] [and] [Edward] has not identified any potential therapists who could continue [Adam's] therapy in Mexico.

¶15     In May 2019, the court held a hearing on Edward's requests; as noted, the court heard oral argument only and not testimony. Counsel for Edward acknowledged it was not "surprised at all that the video chats are somewhat stagnant because you can only do so much when you are never able to be with that person." More broadly, counsel questioned if Edward was ever going to be given placement:

[W]e have to get this started at some point, and if there is never that connection … then I think our system is failing …

> because then we're telling parents that … you can meet all of these things that we tell you to do but by the fact of who you are from birth, you're never going to get reunification. So I would question then why do we even bother with this charade ….

¶16 The Department, in turn, discussed the history of the case and its desire to see "consistency" on Edward's part. It noted that, two years prior, Edward was "very motivated" but that "when we finally got to litigation on that change of placement back in 2017, his entire home dynamic [had] changed without any of us even knowing about it." It acknowledged that "in hindsight we learned a lot from that [placement] request in really trying to think what is best for [Adam]" and that Edward had not followed through with some of the ensuing conditions imposed: participating in therapy, learning about Adam's schooling or medical care, and maintaining all video chat visits. Specifically, the Department pointed out that Edward did not attend the "very crucial" family therapy session scheduled in October 2018, "[a]nd he really, he hasn't done anything since" regarding therapy. The Department's "biggest concern," however, was that Adam did not know and could not communicate with his stepmother, who would be his primary caregiver. In response, Edward's counsel pointed out that Adam should have been learning Spanish during the past year, but that he could learn the language quickly if immersed; that Edward could take some time off work to help with Adam's transition; and that a Mexican therapist could only feasibly be found for Adam once he was living in Mexico.

¶17 The guardian ad litem gave argument echoing the Department's concerns, stressing that Edward's wife had been ignoring "months and months" of requests to participate in video chats. In addition, the guardian was "really afraid that if we send [Adam] to Mexico, we can't get him back." In what was, in effect, a summary of the long history of the case, the guardian acknowledged,

> I know this is a difficult case. If [Edward] was here, it would be a completely different situation…. We could follow up. We could do the home visits, announced and unannounced home visits. We could, you know, make him go to therapy with [Adam]. He's not. And the follow through on his part hasn't been consistent either so I have a lot of concerns.

Edward's counsel did try to explain to the court how the Hague Convention provided a procedure for returning children living abroad to the United States. The court noted, however, "That seems like a bit of oversimplification." Counsel also advised the court that the Mexican and United States consulates were "involved in this case." The Department countered that it had "continued to reach out" to the relevant Mexican authorities without any response, "so we don't have any guarantees or assurances that they're even still working with [Edward]."

¶18 At the close of argument, the court gave its oral ruling, denying Edward's requests both for change of placement and trial reunification. In the court's view, there were "just too many red flags": "[t]he language barrier, the safety concerns, the lack of follow through, the lack of consistent engagement, the fact that [Adam] would be going to a foreign country...." Edward brought a motion for postdisposition relief, which was also denied, and this appeal followed.

## DISCUSSION

¶19 The circuit court may order a change of placement or trial reunification for a child subject to a CHIPS dispositional order where, in its discretion, it determines that doing so is in the child's best interest. *See Sallie T. v. Milwaukee County DHHS*, 219 Wis. 2d 296, 305, 581 N.W.2d 182 (1998), *abrogated on other grounds by Village of Trempealeau v. Mikrut*, 2004 WI 79, 273 Wis. 2d 76, 681 N.W.2d 190; *Richard H. v. Tina B.*, 2014 WI App 123, ¶¶45-49, 359 Wis. 2d 204, 857 N.W.2d 432; WIS. STAT. §§ 48.01(1), 48.357, 48.358(2)(d).

10

We review this decision for an erroneous exercise of discretion, meaning we will reverse only where "'the circuit court has not exercised discretion or … has exercised discretion on the basis of an error of law or irrelevant or impermissible factors.'" *Richard H.*, 359 Wis. 2d 204, ¶45 (quoting *Barstad v. Frazier*, 118 Wis. 2d 549, 554, 348 N.W.2d 479 (1984)). Where the court "applies the correct legal criteria, its decision is virtually invulnerable." *Richard D. v. Rebecca G.*, 228 Wis. 2d 658, 670, 599 N.W.2d 90 (Ct. App. 1999) (citation omitted).

¶20 Edward raises two arguments on appeal. First, he argues that the circuit court erroneously exercised its discretion when it denied his requests without making any factual findings. We disagree that the circuit court "failed to make any findings," however, as it plainly stated that there were "just too many red flags," including "[t]he language barrier, the safety concerns, the lack of follow through, the lack of consistent engagement, [and] the fact that [Adam] would be going to a foreign country." Each finding is supported by the entirety of the record. For example, the court heard that Edward had missed scheduled video calls and a key therapy session and had not requested Adam's report cards, which could reasonably indicate a lack of "follow through" or "consistent engagement." Edward also appears to argue that, in the alternative, the court should have discussed each factual finding with greater specificity—explaining, for example, what the particular "safety concerns" were. Edward fails to develop this point, however, or present any authority supporting his position that the court was required to make a more detailed factual record. Accordingly, we address it no further. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (we may decline to review arguments that are inadequately briefed or unsupported by legal authority).

¶21 Edward next argues that the "sole reason" his requests were denied was "because of his status as a citizen of Mexico." The result, he contends, is that

the circuit court applied WIS. STAT. §§ 48.357 and 48.358 in a manner that violated his equal protection rights under the federal and state constitutions. *See State v. Feldmann*, 2007 WI App 35, ¶¶7-9 & n.2, 300 Wis. 2d 474, 730 N.W.2d 440; *State v. Martin*, 191 Wis. 2d 646, 651-52, 530 N.W.2d 420 (Ct. App. 1995). After a thorough review of the record, however, we find no factual basis for this assertion. There is no evidence of animus towards, or discrimination against, Edward on the basis of his national origin or citizenship. Instead, the circuit court, at various times, expressed a number of reasonable concerns stemming from Edward's international *location* and his *inability to live in or visit the United States*. Over the course of multiple hearings, the court heard testimony or argument that: (1) there was no procedure or enforcement mechanism (or at least none described to the court in any detail) for returning Adam to the United States if he were unsafe in Edward's care[6]; and (2) the relevant Mexican authorities, with whom the Department would presumably be cooperating, were not communicating with the Department. In its determination of Adam's best interest, it was surely sensible for the court to weigh these considerations.

¶22     That said, it is somewhat troubling—and we sympathize with Edward on this point—that his requests were denied partly because the *Department* was not fully able to address the circuit court's concerns. If placement or trial reunification were in Adam's best interest, then it would be an institutional failure to deny those requests solely because of logistical difficulties or bureaucratic incapacity. We need not speculate on how we might approach such a scenario, however, because that is

---

[6] The parties, at times, phrased this concern as one over "jurisdiction." It is unclear whether the parties simply meant the Adam might not be easily returned to the United States upon court order, because of the lack of any streamlined enforcement mechanism, noncooperation by the Mexican authorities, etc. We need not address, for the purpose of this appeal, how CHIPS jurisdiction under WIS. STAT. § 48.13 applies in the international context.

12

not the one before us. The court articulated—and the record supports—a number of other "red flags" fully within Edward's control. Thus, we cannot conclude that the circuit court erroneously exercised its discretion in determining, for example, that Edward's at-times sporadic involvement in Adam's life, or Adam's lack of relationship with his primary caretaker, warranted denying the requests. A review of the full history of this case indicates that Edward was, in some respects, motivated to gain placement—but was less motivated in other important respects. Edward's international location (and, again, *not* his citizenship or national origin) complicated this process but cannot entirely explain his failure to address the court's and the Department's concerns or complete his conditions of return.

¶23 We do not view the decision of the circuit court—which evidences a commendable level of care and attention in this unusual CHIPS case—as suggesting that reunification will not be possible at some point in the future. Nor does our decision in any way preclude future reunification. We are cognizant of steps Edward took to effectuate placement in the face of some real, practical barriers, which at times prevented meaningful engagement with his son. On this record, however, we cannot find that the circuit court erroneously exercised its discretion by denying placement and trial reunification, given the number of outstanding "red flags" or concerns Edward had yet to address. We affirm.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

13